# CHANDLER ET AL. *v.* MILLER, GOVERNOR OF GEORGIA, ET AL.

No. 96–126.   Argued January 14, 1997—Decided April 15, 1997

306

*Walker L. Chandler*, petitioner, argued the cause and filed a brief *pro se.* With him on the briefs for petitioners was *Robert E. Turner.*

*Patricia Guilday*, Assistant Attorney General of Georgia, argued the cause for respondents. With her on the brief were *Michael J. Bowers*, Attorney General, *Michael E.*

*Hobbs*, Deputy Attorney General, and *Dennis D. Dunn*, Senior Assistant Attorney General.*

JUSTICE GINSBURG delivered the opinion of the Court.

The Fourth Amendment requires government to respect "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." This restraint on government conduct generally bars officials from undertaking a search or seizure absent individualized suspicion. Searches conducted without grounds for suspicion of particular individuals have been upheld, however, in "certain limited circumstances." See *Treasury Employees* v. *Von Raab*, 489 U. S. 656, 668 (1989). These circumstances include brief stops for questioning or observation at a fixed Border Patrol checkpoint, *United States* v. *Martinez-Fuerte*, 428 U. S. 543, 545–550, 566–567 (1976), or at a sobriety checkpoint, *Michigan Dept. of State Police* v. *Sitz*, 496 U. S. 444, 447, 455 (1990), and administrative inspections in "closely regulated" businesses, *New York* v. *Burger*, 482 U. S. 691, 703–704 (1987).

Georgia requires candidates for designated state offices to certify that they have taken a drug test and that the test result was negative. Ga. Code Ann. § 21–2–140 (1993) (hereinafter § 21–2–140). We confront in this case the question whether that requirement ranks among the limited circumstances in which suspicionless searches are warranted. Relying on this Court's precedents sustaining drug-testing

---

*Stephen H. Sachs, Steven R. Shapiro, Gerald R. Weber, Arthur B. Spitzer,* and *Barbara E. Bergman* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging reversal.

*Richard K. Willard, Daniel J. Popeo,* and *Paul D. Kamenar* filed a brief for the Washington Legal Foundation et al. as *amici curiae* urging affirmance.

*Acting Solicitor General Dellinger, Assistant Attorney General Hunger, Deputy Solicitor General Waxman, James A. Feldman, Leonard Schaitman,* and *Edward Himmelfarb* filed a brief for the United States as *amicus curiae.*

programs for student athletes, customs employees, and railway employees, see *Vernonia School Dist. 47J* v. *Acton*, 515 U. S. 646, 650, 665–666 (1995) (random drug testing of students who participate in interscholastic sports); *Von Raab*, 489 U. S., at 659 (drug tests for United States Customs Service employees who seek transfer or promotion to certain positions); *Skinner* v. *Railway Labor Executives' Assn.*, 489 U. S. 602, 608–613 (1989) (drug and alcohol tests for railway employees involved in train accidents and for those who violate particular safety rules), the United States Court of Appeals for the Eleventh Circuit judged Georgia's law constitutional. We reverse that judgment. Georgia's requirement that candidates for state office pass a drug test, we hold, does not fit within the closely guarded category of constitutionally permissible suspicionless searches.

## I

The prescription at issue, approved by the Georgia Legislature in 1990, orders that "[e]ach candidate seeking to qualify for nomination or election to a state office shall as a condition of such qualification be required to certify that such candidate has tested negative for illegal drugs." § 21–2–140(b). Georgia was the first, and apparently remains the only, State to condition candidacy for state office on a drug test.

Under the Georgia statute, to qualify for a place on the ballot, a candidate must present a certificate from a state-approved laboratory, in a form approved by the Secretary of State, reporting that the candidate submitted to a urinalysis drug test within 30 days prior to qualifying for nomination or election and that the results were negative. § 21–2–140(c). The statute lists as "[i]llegal drug[s]": marijuana, cocaine, opiates, amphetamines, and phencyclidines. § 21–2–140(a)(3). The designated state offices are: "the Governor, Lieutenant Governor, Secretary of State, Attorney General, State School Superintendent, Commissioner of Insurance,

Commissioner of Agriculture, Commissioner of Labor, Justices of the Supreme Court, Judges of the Court of Appeals, judges of the superior courts, district attorneys, members of the General Assembly, and members of the Public Service Commission." § 21–2–140(a)(4).

Candidate drug tests are to be administered in a manner consistent with the United States Department of Health and Human Services Guidelines, 53 Fed. Reg. 11979–11989 (1988), or other professionally valid procedures approved by Georgia's Commissioner of Human Resources. See § 21–2–140(a)(2). A candidate may provide the test specimen at a laboratory approved by the State, or at the office of the candidate's personal physician, see App. 4–5 (Joint Statement of Undisputed Facts). Once a urine sample is obtained, an approved laboratory determines whether any of the five specified illegal drugs are present, *id.*, at 5; § 21–2–140(c), and prepares a certificate reporting the test results to the candidate.

Petitioners were Libertarian Party nominees in 1994 for state offices subject to the requirements of § 21–2–140. The Party nominated Walker L. Chandler for the office of Lieutenant Governor, Sharon T. Harris for the office of Commissioner of Agriculture, and James D. Walker for the office of member of the General Assembly. In May 1994, about one month before the deadline for submission of the certificates required by § 21–2–140, petitioners Chandler, Harris, and Walker filed this action in the United States District Court for the Northern District of Georgia. They asserted, *inter alia*, that the drug tests required by § 21–2–140 violated their rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution. Naming as defendants Governor Zell D. Miller and two other state officials involved in the administration of § 21–2–140, petitioners requested declaratory and injunctive relief barring enforcement of the statute.

In June 1994, the District Court denied petitioners' motion for a preliminary injunction. Stressing the importance of the state offices sought and the relative unintrusiveness of the testing procedure, the court found it unlikely that petitioners would prevail on the merits of their claims. App. to Pet. for Cert. 5B. Petitioners apparently submitted to the drug tests, obtained the certificates required by § 21–2–140, and appeared on the ballot. See Tr. of Oral Arg. 5. After the 1994 election, the parties jointly moved for the entry of final judgment on stipulated facts. In January 1995, the District Court entered final judgment for respondents.

A divided Eleventh Circuit panel affirmed. 73 F. 3d 1543 (1996). It is settled law, the court accepted, that the drug tests required by the statute rank as searches. But, as was true of the drug-testing programs at issue in *Skinner* and *Von Raab*, the court reasoned, § 21–2–140 serves "special needs," interests other than the ordinary needs of law enforcement. The court therefore endeavored to " 'balance the individual's privacy expectations against the Government's interests to determine whether it [was] impractical to require a warrant or some level of individualized suspicion in the particular context.' " 73 F. 3d, at 1545 (quoting *Von Raab*, 489 U. S., at 665–666).

Examining the state interests involved, the court acknowledged the absence of any record of drug abuse by elected officials in Georgia. Nonetheless, the court observed, "[t]he people of Georgia place in the trust of their elected officials . . . their liberty, their safety, their economic well-being, [and] ultimate responsibility for law enforcement." 73 F. 3d, at 1546. Consequently, "those vested with the highest executive authority to make public policy in general and frequently to supervise Georgia's drug interdiction efforts in particular must be persons appreciative of the perils of drug use." *Ibid.* The court further noted that "[t]he nature of high public office in itself demands the highest levels of honesty, clear-sightedness, and clear-thinking." *Ibid.* Re-

citing responsibilities of the offices petitioners sought, the Court of Appeals perceived those "positions [as] particularly susceptible to the 'risks of bribery and blackmail against which the Government is entitled to guard.'" *Ibid.* (quoting *Von Raab*, 489 U. S., at 674).

Turning to petitioners' privacy interests, the Eleventh Circuit emphasized that the tests could be conducted in the office of the candidate's private physician, making the "intrusion here . . . even less than that approved in *Von Raab*." 73 F. 3d, at 1547. The court also noted the statute's reference to federally approved drug-testing guidelines. *Ibid.* The drug test itself would reveal only the presence or absence of indicia of the use of particular drugs, and not any other information about the health of the candidate. Furthermore, the candidate would control release of the test results: Should the candidate test positive, he or she could forfeit the opportunity to run for office, and in that event, nothing would be divulged to law enforcement officials. *Ibid.* Another consideration, the court said, is the reality that "candidates for high office must expect the voters to demand some disclosures about their physical, emotional, and mental fitness for the position." *Ibid.* Concluding that the State's interests outweighed the privacy intrusion caused by the required certification, the court held the statute, as applied to petitioners, not inconsistent with the Fourth and Fourteenth Amendments. *Ibid.*[1]

Judge Barkett dissented. In her view, a balance of the State's and candidates' interests was not appropriate, for the State had failed to establish a special governmental need for the regime. "There is nothing so special or immediate about the generalized governmental interests involved here," she observed, "as to warrant suspension of the Fourth

---

[1] The court also rejected equal protection and free speech pleas made by petitioners. 73 F. 3d, at 1547–1549. We hold § 21–2–140 incompatible with the Fourth and Fourteenth Amendments, and do not reach petitioners' further pleas.

Amendment's requirement of individualized suspicion for searches and seizures." *Id.*, at 1551.

We granted the petition for certiorari, 518 U. S. 1057 (1996), and now reverse.[2]

## II

We begin our discussion of this case with an uncontested point: Georgia's drug-testing requirement, imposed by law and enforced by state officials, effects a search within the meaning of the Fourth and Fourteenth Amendments. See *Skinner*, 489 U. S., at 617; Tr. of Oral Arg. 36; Brief for United States as *Amicus Curiae* 10 (collection and testing of urine to meet Georgia's certification statute "constitutes a search subject to the demands of the Fourth Amendment" (internal quotation marks omitted)). As explained in *Skinner*, government-ordered "collection and testing of urine intrudes upon expectations of privacy that society has long recognized as reasonable." 489 U. S., at 617. Because "these intrusions [are] searches under the Fourth Amendment," *ibid.*, we focus on the question: Are the searches reasonable?

To be reasonable under the Fourth Amendment, a search ordinarily must be based on individualized suspicion of wrongdoing. See *Vernonia*, 515 U. S., at 652–653. But particularized exceptions to the main rule are sometimes warranted based on "special needs, beyond the normal need for law enforcement." *Skinner*, 489 U. S., at 619 (internal

---

[2] The United States, as *amicus curiae* in support of respondents, suggests that this case may have become moot because there is no continuing controversy regarding the now-completed 1994 election, and petitioners, who did not sue on behalf of a class, failed to assert in the courts below that they intended to run for a covered state office in a future election. See Brief for United States as *Amicus Curiae* 9–10, n. 4. We reject the suggestion of mootness. Petitioner Chandler represented, as an officer of this Court, that he plans to run again, and counsel for the State does not contest that representation. See Tr. of Oral Arg. 4–6, 27; see also 28 U. S. C. § 1653 (defective allegations of jurisdiction curable by amendment at trial or in appellate stages).

quotation marks omitted). When such "special needs"—concerns other than crime detection—are alleged in justification of a Fourth Amendment intrusion, courts must undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties. See *Von Raab*, 489 U. S., at 665–666; see also *id.*, at 668. As *Skinner* stated: "In limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion." 489 U. S., at 624.

In evaluating Georgia's ballot-access, drug-testing statute—a measure plainly not tied to individualized suspicion—the Eleventh Circuit sought to "'balance the individual's privacy expectations against the [State's] interests,'" 73 F. 3d, at 1545 (quoting *Von Raab*, 489 U. S., at 665), in line with our precedents most immediately in point: *Skinner*, *Von Raab*, and *Vernonia*. We review those decisions before inspecting Georgia's law.

A

*Skinner* concerned Federal Railroad Administration (FRA) regulations that required blood and urine tests of rail employees involved in train accidents; the regulations also authorized railroads to administer breath and urine tests to employees who violated certain safety rules. 489 U. S., at 608–612. The FRA adopted the drug-testing program in response to evidence of drug and alcohol abuse by some railroad employees, the obvious safety hazards posed by such abuse, and the documented link between drug- and alcohol-impaired employees and the incidence of train accidents. *Id.*, at 607–608. Recognizing that the urinalysis tests, most conspicuously, raised evident privacy concerns, the Court noted two offsetting considerations: First, the regulations reduced the intrusiveness of the collection process, *id.*, at 626;

and, more important, railway employees, "by reason of their participation in an industry that is regulated pervasively to ensure safety," had diminished expectations of privacy, *id.*, at 627.

"[S]urpassing safety interests," the Court concluded, warranted the FRA testing program. *Id.*, at 634. The drug tests could deter illegal drug use by railroad employees, workers positioned to "cause great human loss before any signs of impairment become noticeable to supervisors." *Id.*, at 628. The program also helped railroads to obtain invaluable information about the causes of major train accidents. See *id.*, at 630. Testing without a showing of individualized suspicion was essential, the Court explained, if these vital interests were to be served. See *id.*, at 628. Employees could not forecast the timing of an accident or a safety violation, events that would trigger testing. The employee's inability to avoid detection simply by staying drug free at a prescribed test time significantly enhanced the deterrent effect of the program. See *ibid.* Furthermore, imposing an individualized suspicion requirement for a drug test in the chaotic aftermath of a train accident would seriously impede an employer's ability to discern the cause of the accident; indeed, waiting until suspect individuals could be identified "likely would result in the loss or deterioration of the evidence furnished by the tests." *Id.*, at 631.

In *Von Raab*, the Court sustained a United States Customs Service program that made drug tests a condition of promotion or transfer to positions directly involving drug interdiction or requiring the employee to carry a firearm. 489 U. S., at 660–661, 667–677.[3] While the Service's regime was

---

[3] The Service's program also required tests for individuals promoted or transferred to positions in which they would handle "classified" material. 489 U. S., at 661. The Court agreed that the Government "ha[d] a compelling interest in protecting truly sensitive information." *Id.*, at 677. However, we did not rule on this aspect of the program, see *id.*, at 677–678,

not prompted by a demonstrated drug abuse problem, *id.*, at 660, it was developed for an agency with an "almost unique mission," *id.*, at 674, as the "first line of defense" against the smuggling of illicit drugs into the United States, *id.*, at 668. Work directly involving drug interdiction and posts that require the employee to carry a firearm pose grave safety threats to employees who hold those positions, and also expose them to large amounts of illegal narcotics and to persons engaged in crime; illicit drug users in such high-risk positions might be unsympathetic to the Service's mission, tempted by bribes, or even threatened with blackmail. See *id.*, at 668–671. The Court held that the Government had a "compelling" interest in assuring that employees placed in these positions would not include drug users. See *id.*, at 670–671. Individualized suspicion would not work in this setting, the Court determined, because it was "not feasible to subject [these] employees and their work product to the kind of day-to-day scrutiny that is the norm in more traditional office environments." *Id.*, at 674.

Finally, in *Vernonia*, the Court sustained a random drug-testing program for high school students engaged in interscholastic athletic competitions. The program's context was critical, for a local government bears large "responsibilities, under a public school system, as guardian and tutor of children entrusted to its care." 515 U. S., at 665. An "immediate crisis," *id.*, at 663, caused by "a sharp increase in drug use" in the school district, *id.*, at 648, sparked installation of the program. District Court findings established that student athletes were not only "among the drug users," they were "leaders of the drug culture." *Id.*, at 649. Our decision noted that "'students within the school environment have a lesser expectation of privacy than members of the population generally.'" *Id.*, at 657 (quoting *New Jersey* v.

---

because the record did not clarify "whether the category defined by the [regulation] encompas[sed] only those Customs employees likely to gain access to sensitive information," *id.*, at 678.

*T. L. O.*, 469 U. S. 325, 348 (1985) (Powell, J., concurring)). We emphasized the importance of deterring drug use by schoolchildren and the risk of injury a drug-using student athlete cast on himself and those engaged with him on the playing field. See *Vernonia*, 515 U. S., at 662.

B

Respondents urge that the precedents just examined are not the sole guides for assessing the constitutional validity of the Georgia statute. The "special needs" analysis, they contend, must be viewed through a different lens because § 21–2–140 implicates Georgia's sovereign power, reserved to it under the Tenth Amendment, to establish qualifications for those who seek state office. Respondents rely on *Gregory* v. *Ashcroft*, 501 U. S. 452 (1991), which upheld against federal statutory and Equal Protection Clause challenges Missouri's mandatory retirement age of 70 for state judges. The Court found this age classification reasonable and not barred by the federal legislation. See *id.*, at 473. States, *Gregory* reaffirmed, enjoy wide latitude to establish conditions of candidacy for state office, but in setting such conditions, they may not disregard basic constitutional protections. See *id.*, at 463; *McDaniel* v. *Paty*, 435 U. S. 618 (1978) (invalidating state provision prohibiting members of clergy from serving as delegates to state constitutional convention); *Communist Party of Ind.* v. *Whitcomb*, 414 U. S. 441 (1974) (voiding loyalty oath as a condition of ballot access); *Bond* v. *Floyd*, 385 U. S. 116 (1966) (Georgia Legislature could not exclude elected representative on ground that his antiwar statements cast doubt on his ability to take an oath). We are aware of no precedent suggesting that a State's power to establish qualifications for state offices—any more than its sovereign power to prosecute crime—diminishes the constraints on state action imposed by the Fourth Amendment. We therefore reject respondents' invitation to apply in this case a framework extraordinarily deferential to state meas-

ures setting conditions of candidacy for state office. Our guides remain *Skinner, Von Raab*, and *Vernonia.*

Turning to those guides, we note, first, that the testing method the Georgia statute describes is relatively noninvasive; therefore, if the "special needs" showing had been made, the State could not be faulted for excessive intrusion. Georgia's statute invokes the drug-testing guidelines applicable to the federal programs upheld in *Skinner* and *Von Raab*. See Brief for United States as *Amicus Curiae* 20–21; *Von Raab*, 489 U. S., at 661–662, n. 1. The State permits a candidate to provide the urine specimen in the office of his or her private physician; and the results of the test are given first to the candidate, who controls further dissemination of the report. Because the State has effectively limited the invasiveness of the testing procedure, we concentrate on the core issue: Is the certification requirement warranted by a special need?

Our precedents establish that the proffered special need for drug testing must be substantial—important enough to override the individual's acknowledged privacy interest, sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized suspicion. See *supra*, at 313–317 and this page. Georgia has failed to show, in justification of § 21–2–140, a special need of that kind.

Respondents' defense of the statute rests primarily on the incompatibility of unlawful drug use with holding high state office. The statute is justified, respondents contend, because the use of illegal drugs draws into question an official's judgment and integrity; jeopardizes the discharge of public functions, including antidrug law enforcement efforts; and undermines public confidence and trust in elected officials. Brief for Respondents 11–18. The statute, according to respondents, serves to deter unlawful drug users from becoming candidates and thus stops them from attaining high state office. *Id.*, at 17–18. Notably lacking in respondents' pres-

entation is any indication of a concrete danger demanding departure from the Fourth Amendment's main rule.

Nothing in the record hints that the hazards respondents broadly describe are real and not simply hypothetical for Georgia's polity. The statute was not enacted, as counsel for respondents readily acknowledged at oral argument, in response to any fear or suspicion of drug use by state officials:

> "QUESTION: Is there any indication anywhere in this record that Georgia has a particular problem here with State officeholders being drug abusers?
>
> "[COUNSEL FOR RESPONDENTS]: No, there is no such evidence, [and] to be frank, there is no such problem as we sit here today." Tr. of Oral Arg. 32.

See also *id.*, at 31 (counsel for respondents affirms absence of evidence that state officeholders in Georgia have drug problems). A demonstrated problem of drug abuse, while not in all cases necessary to the validity of a testing regime, see *Von Raab*, 489 U. S., at 673–675, would shore up an assertion of special need for a suspicionless general search program. Proof of unlawful drug use may help to clarify—and to substantiate—the precise hazards posed by such use. Thus, the evidence of drug and alcohol use by railway employees engaged in safety-sensitive tasks in *Skinner*, see 489 U. S., at 606–608, and the immediate crisis prompted by a sharp rise in students' use of unlawful drugs in *Vernonia*, see 515 U. S., at 662–663, bolstered the Government's and school officials' arguments that drug-testing programs were warranted and appropriate.

In contrast to the effective testing regimes upheld in *Skinner, Von Raab,* and *Vernonia,* Georgia's certification requirement is not well designed to identify candidates who violate antidrug laws. Nor is the scheme a credible means to deter illicit drug users from seeking election to state office. The test date—to be scheduled by the candidate anytime within

30 days prior to qualifying for a place on the ballot—is no secret. As counsel for respondents acknowledged at oral argument, users of illegal drugs, save for those prohibitively addicted, could abstain for a pretest period sufficient to avoid detection. See Tr. of Oral Arg. 44–46.[4] Even if we indulged respondents' argument that one purpose of § 21–2–140 might be to detect those unable so to abstain, see *id.*, at 46, respondents have not shown or argued that such persons are likely to be candidates for public office in Georgia. Moreover, respondents have offered no reason why ordinary law enforcement methods would not suffice to apprehend such addicted individuals, should they appear in the limelight of a public stage. Section 21–2–140, in short, is not needed and cannot work to ferret out lawbreakers, and respondents barely attempt to support the statute on that ground.

Respondents and the United States as *amicus curiae* rely most heavily on our decision in *Von Raab*, which sustained a drug-testing program for Customs Service officers prior to promotion or transfer to certain high-risk positions, despite the absence of any documented drug abuse problem among Service employees. 489 U. S., at 660; see Brief for Respondents 12–14; Brief for United States as *Amicus Curiae* 18; see also 73 F. 3d, at 1546. The posts in question in *Von Raab* directly involved drug interdiction or otherwise required the Service member to carry a firearm. See 489 U. S., at 670 ("Government has a compelling interest in ensuring that front-line interdiction personnel are physically fit, and have unimpeachable integrity and judgment."); *id.*, at 670–671 ("[T]he public should not bear the risk that employees who may suffer from impaired perception and judgment will be promoted to positions where they may need to employ deadly force.").

---

[4] In *Treasury Employees* v. *Von Raab*, 489 U. S. 656 (1989), the applicant for promotion or transfer could not know precisely when action would be taken on the application. In contrast, the potential candidate knows from the start the timing of all relevant events.

Hardly a decision opening broad vistas for suspicionless searches, *Von Raab* must be read in its unique context. As the Customs Service reported in announcing the testing program: "Customs employees, more than any other Federal workers, are routinely exposed to the vast network of organized crime that is inextricably tied to illegal drug use." *National Treasury Employees Union* v. *Von Raab*, 816 F. 2d 170, 173 (CA5 1987) (internal quotation marks omitted), aff'd in part, vacated in part, 489 U. S. 656 (1989). We stressed that "[d]rug interdiction ha[d] become the agency's primary enforcement mission," *id.*, at 660, and that the employees in question would have "access to vast sources of valuable contraband," *id.*, at 669. Furthermore, Customs officers "ha[d] been the targets of bribery by drug smugglers on numerous occasions," and several had succumbed to the temptation. *Ibid.*

Respondents overlook a telling difference between *Von Raab* and Georgia's candidate drug-testing program. In *Von Raab* it was "not feasible to subject employees [required to carry firearms or concerned with interdiction of controlled substances] and their work product to the kind of day-to-day scrutiny that is the norm in more traditional office environments." *Id.*, at 674. Candidates for public office, in contrast, are subject to relentless scrutiny—by their peers, the public, and the press. Their day-to-day conduct attracts attention notably beyond the norm in ordinary work environments.

What is left, after close review of Georgia's scheme, is the image the State seeks to project. By requiring candidates for public office to submit to drug testing, Georgia displays its commitment to the struggle against drug abuse. The suspicionless tests, according to respondents, signify that candidates, if elected, will be fit to serve their constituents free from the influence of illegal drugs. But Georgia asserts no evidence of a drug problem among the State's elected officials, those officials typically do not perform high-risk,

safety-sensitive tasks, and the required certification immediately aids no interdiction effort. The need revealed, in short, is symbolic, not "special," as that term draws meaning from our case law.

In *Von Raab*, the Customs Service had defended its officer drug-testing program in part as a way to demonstrate the agency's commitment to enforcement of the law. See Brief for United States in *Treasury Employees* v. *Von Raab*, O. T. 1988, No. 86–1879, pp. 35–36. The *Von Raab* Court, however, did not rely on that justification. Indeed, if a need of the "set a good example" genre were sufficient to overwhelm a Fourth Amendment objection, then the care this Court took to explain why the needs in *Skinner*, *Von Raab*, and *Vernonia* ranked as "special" wasted many words in entirely unnecessary, perhaps even misleading, elaborations.

In a pathmarking dissenting opinion, Justice Brandeis recognized the importance of teaching by example: "Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example." *Olmstead* v. *United States*, 277 U. S. 438, 485 (1928). Justice Brandeis explained in *Olmstead* why the Government set a bad example when it introduced in a criminal proceeding evidence obtained through an unlawful Government wiretap:

> "[I]t is . . . immaterial that the intrusion was in aid of law enforcement. Experience should teach us to be most on our guard to protect liberty when the Government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding." *Id.*, at 479.

However well meant, the candidate drug test Georgia has devised diminishes personal privacy for a symbol's sake. The Fourth Amendment shields society against that state action.

## III

We note, finally, matters this opinion does not treat. Georgia's singular drug test for candidates is not part of a medical examination designed to provide certification of a candidate's general health, and we express no opinion on such examinations. Nor do we touch on financial disclosure requirements, which implicate different concerns and procedures. See, *e. g., Barry* v. *City of New York*, 712 F. 2d 1554 (CA2 1983) (upholding city's financial disclosure law for elected and appointed officials, candidates for city office, and certain city employees); *Plante* v. *Gonzalez*, 575 F. 2d 1119 (CA5 1978) (upholding Florida's financial disclosure requirements for certain public officers, candidates, and employees). And we do not speak to drug testing in the private sector, a domain unguarded by Fourth Amendment constraints. See *United States* v. *Jacobsen*, 466 U. S. 109, 113 (1984).

We reiterate, too, that where the risk to public safety is substantial and real, blanket suspicionless searches calibrated to the risk may rank as "reasonable"—for example, searches now routine at airports and at entrances to courts and other official buildings. See *Von Raab*, 489 U. S., at 674–676, and n. 3. But where, as in this case, public safety is not genuinely in jeopardy, the Fourth Amendment precludes the suspicionless search, no matter how conveniently arranged.

\*     \*     \*

For the reasons stated, the judgment of the Court of Appeals for the Eleventh Circuit is

*Reversed.*

CHIEF JUSTICE REHNQUIST, dissenting.

I fear that the novelty of this Georgia law has led the Court to distort Fourth Amendment doctrine in order to strike it down. The Court notes, impliedly turning up its nose, that "Georgia was the first, and apparently remains the only, State to condition candidacy for state office on a drug

test." *Ante,* at 309. But if we are to heed the oft-quoted words of Justice Brandeis in his dissent in *New State Ice Co. v. Liebmann,* 285 U. S. 262, 311 (1932)—"[i]t is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country"—novelty itself is not a vice. These novel experiments, of course, must comply with the United States Constitution; but their mere novelty should not be a strike against them.

Few would doubt that the use of illegal drugs and abuse of legal drugs is one of the major problems of our society. Cases before this Court involving drug use extend to numerous occupations—railway employees, *Skinner* v. *Railway Labor Executives' Assn.,* 489 U. S. 602 (1989), Border Patrol officers, *Treasury Employees* v. *Von Raab,* 489 U. S. 656 (1989), high school students, *Vernonia School Dist. 47J* v. *Acton,* 515 U. S. 646 (1995), and machine operators, *Paperworkers* v. *Misco, Inc.,* 484 U. S. 29 (1987). It would take a bolder person than I to say that such widespread drug usage could never extend to candidates for public office such as Governor of Georgia. The Court says that "[n]othing in the record hints that the hazards respondents broadly describe are real and not simply hypothetical for Georgia's polity." *Ante,* at 319. But surely the State need not wait for a drug addict, or one inclined to use drugs illegally, to run for or actually become Governor before it installs a prophylactic mechanism. We held as much in *Von Raab:*

> "First, petitioners argue that the program is unjustified because it is not based on a belief that testing will reveal any drug use by covered employees. In pressing this argument, petitioners point out that the Service's testing scheme was not implemented in response to any perceived drug problem among Customs employees . . . .
>
> "Petitioners' first contention evinces an unduly narrow view of the context in which the Service's testing

program was implemented. Petitioners do not dispute, nor can there be doubt, that drug abuse is one of the most serious problems confronting our society today. There is little reason to believe that American workplaces are immune from this pervasive social problem . . . ." 489 U. S., at 673–674.

The test under the Fourth Amendment, as these cases have held, is whether the search required by the Georgia statute is "reasonable." Today's opinion speaks of a "closely guarded" class of permissible suspicionless searches which must be justified by a "special need." But this term, as used in *Skinner* and *Von Raab* and on which the Court now relies, was used in a quite different sense than it is used by the Court today. In *Skinner* and *Von Raab* it was used to describe a basis for a search apart from the regular needs of law enforcement, *Skinner, supra,* at 620; *Von Raab, supra,* at 669. The "special needs" inquiry as delineated there has not required especially great "importan[ce]," *ante,* at 318, unless one considers "the supervision of probationers," or the "operation of a government office," *Skinner, supra,* at 620, to be especially "important." Under our precedents, if there was a proper governmental purpose other than law enforcement, there was a "special need," and the Fourth Amendment then required the familiar balancing between that interest and the individual's privacy interest.

Under normal Fourth Amendment analysis, the individual's expectation of privacy is an important factor in the equation. But here, the Court perversely relies on the fact that a candidate for office *gives up* so much privacy—"[c]andidates for public office . . . are subject to relentless scrutiny—by their peers, the public, and the press," *ante,* at 321—as a reason for *sustaining* a Fourth Amendment claim. The Court says, in effect, that the kind of drug test for candidates required by the Georgia law is unnecessary, because the scrutiny to which they are already subjected by reason of their candidacy will enable people to detect any drug use on

their part. But this is a strange holding, indeed. One might just as easily say that the railroad employees in *Skinner*, or the Customs officials in *Von Raab*, would be subjected to the same sort of scrutiny from their fellow employees and their supervisors. But the clear teaching of those cases is that the government is not required to settle for that sort of a vague and uncanalized scrutiny; if in fact preventing persons who use illegal drugs from concealing that fact from the public is a legitimate government interest, these cases indicate that the government may require a drug test.

The privacy concerns ordinarily implicated by urinalysis drug testing are "negligible," *Vernonia, supra*, at 658, when the procedures used in collecting and analyzing the urine samples are set up "to reduce the intrusiveness" of the process, *Skinner, supra*, at 626. Under the Georgia law, the candidate may produce the test specimen at his own doctor's office, which must be one of the least intrusive types of urinalysis drug tests conceivable. But although the Court concedes this, it nonetheless manages to count this factor against the State, because with this kind of test the person tested will have advance notice of its being given, and will therefore be able to abstain from drug use during the necessary period of time. But one may be sure that if the test were random—and therefore apt to ensnare more users—the Court would then fault it for its intrusiveness. Cf. *Von Raab*, 489 U. S., at 676, and n. 4.

In *Von Raab*, we described as "compelling" the Government interest "in ensuring that many of these covered employees do not use drugs *even off duty*, for such use creates risks of bribery and blackmail against which the Government is entitled to guard." *Id.*, at 674 (emphasis added). The risks of bribery and blackmail for high-level officials of state government using illegal drugs would seem to be at least as significant as those for off-duty Customs officials. Even more important, however, is our treatment of the third class of tested employees in *Von Raab*, those who "handle[d] 'clas-

sified' materials." The Court relegates this discussion to a footnote, *ante*, at 315, n. 3, and all but dismisses it. Although the lack of factual development of the record in *Von Raab* prevented us from determining *who* "handle[d] 'classified' material," we did consider the *weight* of the proffered governmental interest:

> "We readily agree that the Government has a compelling interest in protecting truly sensitive information from those who, 'under compulsion of circumstances or for other reasons, . . . might compromise [such] information.' *Department of Navy* v. *Egan*, 484 U. S. 518, 528 (1988). . . . We also agree that employees who seek promotions to positions where they would handle sensitive information can be required to submit to a urine test under the Service's screening program, especially if the positions covered under this category require background investigations, medical examinations, or other intrusions that may be expected to diminish their expectations of privacy in respect of a urinalysis test." 489 U. S., at 677.

Although petitioners might raise questions as to some of the other positions covered by the Georgia statute, there is no question that, at least for positions like Governor and Lieutenant Governor, identical concerns are implicated. In short, when measured through the correct lens of our precedents in this area, the Georgia urinalysis test is a "reasonable" search; it is only by distorting these precedents that the Court is able to reach the result it does.

Lest readers expect the holding of this case to be extended to any other case, the Court notes that the drug test here is not a part of a medical examination designed to provide certification of a candidate's general health. *Ante*, at 323. It is all but inconceivable that a case involving that sort of requirement could be decided differently than the present case; the same sort of urinalysis would be involved. The only possible basis for distinction is to say that the State has

a far greater interest in the candidate's "general health" than it does with respect to his propensity to use illegal drugs. But this is the sort of policy judgment that surely must be left to legislatures, rather than being announced from on high by the Federal Judiciary.

Nothing in the Fourth Amendment or in any other part of the Constitution prevents a State from enacting a statute whose principal vice is that it may seem misguided or even silly to the Members of this Court. I would affirm the judgment of the Court of Appeals.