139 F.3d 571
 William P. TODD and Diana J. Todd, on their own behalf and
as next friends for their son, William Matthew
Todd, Steve Hammons, et al., Plaintiffs-Appellants,
v.
RUSH COUNTY SCHOOLS and Ed Lyskowinski, in his official
capacity as Superintendent of the Rush County
Schools, Defendants-Appellees.
 No. 97-2548.
 United States Court of Appeals,
Seventh Circuit.
 Submitted Jan. 29, 1998.
Decided March 19, 1998.
 
 Kenneth J. Falk (submitted), Indiana Civil Liberties Union, Indianapolis, IN, for Plaintiffs-Appellants.
 Rodney V. Taylor, David J. Theising, Christopher & Taylor, Indianapolis, IN, John O. Worth, Rushville, IN, for Defendants-Appellees.
 Before POSNER, Chief Judge, and CUMMINGS, COFFEY, FLAUM, EASTERBROOK, RIPPLE, MANION, KANNE, ROVNER, DIANE P. WOOD and EVANS, Circuit Judges.
 
 
 1
 On consideration of the petition for rehearing with suggestion for rehearing en banc filed by plaintiffs-appellants and the answer of defendants-appellees, all of the judges on the original panel voted to deny rehearing and a majority of the judges in active service voted to deny rehearing en banc. Judge Kenneth F. Ripple dissented from the denial of rehearing en banc and filed an opinion which was joined by Judge Ilana Diamond Rovner. Judge Diane P. Wood dissented from the denial of rehearing en banc and filed an opinion which was joined by Judge Joel M. Flaum.
 
 
 2
 The petition for rehearing is denied.
 
 
 3
 RIPPLE, Circuit Judge, with whom ILANA DIAMOND ROVNER, Circuit Judge, joins, dissenting from the denial of rehearing en banc.
 
 
 4
 This case presents an important and recurring issue with respect to the scope of suspicionless drug testing of children enrolled in public schools. Because the panel decision gives a very broad reading to the Supreme Court's holding in Vernonia School District 47J v. Acton, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995), and seemingly fails to take fully into account the Supreme Court's holding in Chandler v. Miller, 520 U.S. 305, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997), further review is warranted if we are to avoid sanctioning, by implication, the use of a urine sample as the price of admission to the public schools in this circuit.
 
 
 5
 At issue in this case is a suspicionless drug testing program for all students who wish to participate in any extracurricular activity offered by the school. Students who wish to participate in such activities as foreign language clubs, the Future Farmers of America or the Library Club must agree to submit to drug testing as a precondition of their participation. In Vernonia, the Supreme Court articulated the basic approach to suspicionless drug testing: The reasonableness of the search is to be determined by balancing the intrusion into a person's Fourth Amendment interests against the promotion of legitimate governmental interests. See 515 U.S. at 652-53, 115 S.Ct. at 2390-91. Vernonia involved a relatively straightforward situation, a drug testing program for student athletes. In examining the privacy interests at stake, the Court began its analysis by noting that the subjects of the test were school children who were committed to the temporary custody of the state as schoolmaster and therefore expected to be subjected to certain physical examination and inoculation requirements as a condition of their enrollment in the institution. The Court then proceeded to stress that student athletes have a lesser degree of privacy as part of their participation in athletics. Indeed, the Court detailed the locker room arrangements and the need for adherence to other training rules that impinge even more on their expectation of privacy. Id. at 657, 115 S.Ct. at 2392-93. The Court also noted that the process for obtaining the sample was not very intrusive and that the testing methodology was limited to the identification of controlled substances.
 
 
 6
 When the Court turned to the nature of the governmental interest, it mentioned the general concern of deterring drug use among youth. It then focused on the particular need to test the athletes. "[I]t must not be lost sight of that this program is directed more narrowly to drug use by school athletes, where the risk of immediate physical harm to the drug user or those with whom he is playing his sport is particularly high." Id. at 662, 115 S.Ct. at 2395. The Court then noted the "state of rebellion" that existed in that particular student body, especially among those involved in athletics. Id. at 663, 115 S.Ct. at 2395-96. Moving to the efficacy of the means chosen by school authorities to address the problem, the Court noted the "role model" effect of athletes and indeed recognized the wisdom of testing this select group as opposed to the entire student body. Id.
 
 
 7
 Vernonia is susceptible to several different interpretations: (1) that "special needs" justifying drug testing always exist in the public school context, and thus school authorities may require drug testing for any reason including controlling access to core classes, see, e.g., id. at 656, 115 S.Ct. at 2392; (2) that it is necessary to show a particularized governmental need to impose drug testing on a particular student population, see, e.g., Vernonia's "state of rebellion"; (3) that drug testing is permitted in special scholastic environments in which the need is well identified and the privacy expectations are diminished, see, e.g., id. at 657, 115 S.Ct. at 2392-93.
 
 
 8
 Chandler, in striking down a drug testing program for candidates for state office, emphasized that the state had not demonstrated a need for suspicionless searches of the defined group. The targeted group had not been found to have a high degree of drug use, nor did the group, as it was defined by the statute, perform highly sensitive safety-related tasks that required this scrutiny.
 
 
 9
 This case involves an attempt by a school district to subject to suspicionless testing a much broader group than the student athletes involved in the drug testing program in Vernonia. The interests of the Rush County school district are substantially different from the ones at stake in Vernonia. There is, of course, the residual interest of the district in protecting students from illicit drugs. But, unlike the situation in Vernonia, there is no showing of a particularized need because of a "state of rebellion" in the school, and certainly no showing that the targeted group, all students participating in any extracurricular activity, presents a particularized need. In short, the teaching of Chandler that the group be defined in terms that demonstrate the government's special need for such testing is markedly absent unless the Supreme Court intended in Vernonia that all school children are subject to testing all of the time.
 
 
 10
 The panel does not explicitly adopt such a broadstroke reading of Vernonia. Yet, it frankly admits that it condones the suspicionless testing of a great part of the student body. Even more significantly, the panel's formula permits this widespread testing on the ground that "successful extracurricular activities require healthy students." Todd v. Rush County Schools, 133 F.3d 984, 986 (7th Cir.1998). This rationale admits of no principled limitation. Certainly, physics class, math class or any other part of the school's academic endeavor also requires "healthy students." The assertion that students in extracurricular activities can take leadership roles in the schools and the community is a generality that does little to define, with the particularity suggested by Chandler, a group that needs to be tested. Indeed, in Schaill v. Tippecanoe County School Corp., 864 F.2d 1309, 1322 (7th Cir.1988), this court rejected explicitly the suggestion that athletics and other school activities were similarly situated with respect to the need for suspicionless drug testing.
 
 
 11
 Finally, the panel notes that participation in the extracurricular programs is a privilege and participation is voluntary. In Schaill, this court noted that the fact that the consent to drug testing was limited only to athletic programs and therefore could be avoided simply by refraining from participating in the program ought to be weighed in assessing the reasonableness of the search. Here, by contrast, the requirement affects a much broader aspect of student life. Exclusion of a high school student from all extracurricular activities deprives that student of a great deal of what the modern American high school has to offer in terms of academic and personal development.
 
 
 12
 Because of the broad-brushed reading of Vernonia embraced by the panel, its decision takes us a long way toward condoning drug testing in the general school population. The principal reason given for permitting this program--that the demands of extracurricular activities require healthy students--is as true for scholastic matters as it is for extracurricular activities. By avoiding Chandler's emphasis on the need to define with particularity the group for which testing is justified, the panel opinion has left the jurisprudence without any guiding principle to protect against the sort of general search that, from the beginning of the Republic, had been the principal concern of the Fourth Amendment.
 
 
 13
 DIANE P. WOOD, Circuit Judge, with whom FLAUM, Circuit Judge, joins, dissenting from the denial of rehearing en banc.
 
 
 14
 That a panel of this court may have arrived at the correct outcome in a case should only begin our inquiry into whether that case warrants rehearing en banc. The corollary to the recognized proposition that "mere" error of a panel does not merit reconsideration en banc is that certain cases raise recurring, important issues of law that deserve our attention, regardless of the panel's approach.
 
 
 15
 In Vernonia School Dist. 47J v. Acton, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995), the Court upheld a school's policy of randomly drug testing students who voluntarily participated in interscholastic athletics. The Court focused on a variety of factors--that high school athletes have and expect a lesser degree of privacy than other students, id. at 657, 115 S.Ct. at 2392-93; that there was a drug crisis in the Vernonia school district, with evidence that students participating in high school athletics were at its core, id. at 662-63, 115 S.Ct. at 2395-96; that drug use by participants in athletics puts both the user and other athletes at substantial risk of physical harm, id. at 662, 115 S.Ct. at 2395; and that "Fourth Amendment rights ... are different in public schools than elsewhere." Id. at 656, 665, 115 S.Ct. at 2392, 2396-97. Depending on which of these one stresses, Vernonia can be read in varying ways. Was the crucial factor the established drug crisis, and the narrow focus on its leaders? A careful balance between the intrusiveness of this specific search and all factors adding to its acceptability? Cf. Chandler v. Miller, 520 U.S. 305, ----, 117 S.Ct. 1295, 1301, 137 L.Ed.2d 513 (1997). Unique aspects of student athletics? A distinction between extracurricular activities and those required of all? Cf. the panel's opinion, 133 F.3d 984, 986 (7th Cir.1998). Or that public schools are different, so different that randomized searches of all students would be acceptable? But see Vernonia, 515 U.S. at 666, 115 S.Ct. at 2397 (Ginsburg, concurring) (interpreting the majority's opinion as reserving this question).
 
 
 16
 Each of these possible interpretations of Vernonia is plausible; none clearly trumps the others. The only thing that is clear is that we cannot simply say "see Vernonia" and leave it at that. The constitutionality of drug testing in the schools is a problem that will recur, and the legal interpretation of Vernonia we adopt will often be outcome determinative. Because I believe that the clarification and refinement of the Vernonia legal standard is a task well worth the full court's attention, I respectfully dissent from the denial of rehearing en banc.