THIS OPINION HAS NO PRECEDENTIAL VALUE.  IT SHOULD NOT BE CITED OR RELIED ON AS
PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 239(d)(2), SCACR.  
THE STATE OF SOUTH CAROLINA
In The Court of Appeals

 
 
 
The State, Respondent,
v.
 Harlan Gates, Appellant.
 
 
 

Appeal From York County
 J. Ernest Kinard, Jr., Circuit Court Judge

Unpublished Opinion No. 2005-UP-144
Heard December 8, 2004  Filed March 1, 2005

AFFIRMED

 
 
 
Christopher A. Wellborn, of Rock Hill, for Appellant.
Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott, Senior Assistant Attorney General Mark Rapoport, all of Columbia; and Solicitor Thomas E. Pope, of York; for Respondent.
 
 
 

PER CURIAM:  Harlan Gates appeals his conviction for driving under the influence (DUI), alleging the trial court erred in not suppressing the evidence derived from the checkpoint in which he was stopped.  We affirm.
FACTS
Gates approached a checkpoint established in the city of York and was asked to stop.  While speaking with Gates, Deputy Lonnie Vinesett smelled the odor of alcohol and asked Gates to pull off to the side of the road.  Deputy Vinesett asked whether Gates had been drinking and he indicated he had three or four beers.  After failing three field sobriety tests, Gates was arrested for DUI.  His Datamaster test indicated Gates had a blood alcohol concentration of .10.  
At trial, Gates moved to suppress the results of the stop, arguing it was unconstitutional.  York Police Lieutenant Thomas Jenkins testified in camera regarding the checkpoints establishment, purpose, and procedures.  Lt. Jenkins testified there were a number of DUIs and speeding cases in that particular area, and they established the checkpoint, utilizing officers from several different departments.  He testified the checkpoint was established and operated pursuant to York County policies, but each officer was operating under the policy of their particular agency when conducting the stop and any subsequent tests.  
The trial court allowed the evidence into the record, indicating the checkpoint was established for a legitimate purpose, officers stopped all approaching cars, and officers investigated matters typically associated with a traffic checkpoint.  Gates was convicted of DUI (second offense) and sentenced to one year imprisonment and a $5,000 fine, suspended to two days in jail and payment of a $1,000 fine with three years probation.  This appeal followed.
STANDARD OF REVIEW
In criminal cases, the appellate court sits to review errors of law only.  We are bound by the trial courts factual findings unless they are clearly erroneous.  This same standard of review applies to preliminary factual findings in determining the admissibility of certain evidence in criminal cases.  State v. Wilson, 345 S.C. 1, 5-6, 545 S.E.2d 827, 829 (2001) (internal citations omitted).
LAW/ANALYSIS
Gates contends the checkpoint violated his Fourth Amendment right to be free from unreasonable searches and seizures because: (1) the primary purpose was general crime control; and (2) the officers participating retained more discretion than is allowed.  As a result, he maintains the trial court erred in failing to suppress the results of the stop.  We disagree.
I.       Primary Purpose
Gates asserts the primary purpose of the checkpoint was general crime control, which violates the Fourth Amendment.  We disagree and find the checkpoint was established for a legitimate reason.
The Fourth Amendment requires searches and seizures be reasonable. A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing.  Chandler v. Miller, 520 U.S. 305, 308 (1997).  The United States Supreme Court has upheld brief, suspicionless seizures of motorists at a sobriety checkpoint aimed at removing drunk drivers from the road.  See Michigan Dept of State Police v. Sitz, 496 U.S. 444, 455 (1990) (finding the States interest in preventing drunken driving through sobriety checkpoints at which all drivers are briefly stopped advanced public safety and did not violate motorists Fourth Amendment protections).  In Delaware v. Prouse, 440 U.S. 648, 663 (1979), the Court found that random, suspicionless stops to check license and registration of drivers violated the Fourth Amendment, but that in certain circumstances, such as where all cars are stopped, it would be permissible.  However, the Court in Prouse indicated stops for the purpose of the general interest of crime control would not be valid.  Prouse, 440 U.S. at 659 n.18. 
In City of Indianapolis v. Edmond, 531 U.S. 32 (2000), the United States Supreme Court was asked to determine whether a checkpoint for the purpose of detecting illegal narcotics violated the Fourth Amendment.  The Court found the stop for the detection of illegal narcotics was a search for ordinary criminal wrongdoing and, therefore, did not conform to the requirements of the Fourth Amendment.  Edmond, 531 U.S. at 41-42.  The Court held:  

We decline to suspend the usual requirement of individualized suspicion where the police seek to employ a checkpoint primarily for the ordinary enterprise of investigating crimes.  We cannot sanction stops justified only by the generalized and ever-present possibility that interrogation and inspection may reveal that any given motorist has committed some crime. 

Id. at 44.  Thus, while brief suspicionless stops of all vehicles and aimed at public safety do not violate the Fourth Amendment, suspicionless stops aimed at trying to catch a motorist committing some general crime are in direct contravention of the Fourth Amendment guarantees.  
During the in camera hearing in the present case, Lt. Jenkins testified specifically regarding the reasons for the checkpoint and its location.  He stated: 

Public safety.  We keep a record of all the DUIs and all the traffic, you know, among the shifts, that they enter everything into the computer and periodically well go into the computer and see where the most areas where we have a lot of speeding, DUI, reckless driving and that type of stuff and pick out the checkpoints from there.  

Additionally, he testified:  There was a number of DUIs and speeding cases in that particular area.  
Gates counsel questioned Lt. Jenkins regarding the purpose of the checkpoints and the following colloquy occurred:

Q.      So, road blocks are kind of an important crime control measure, arent they?
A.      Correct.
Q.      So when youre setting up these road blocks, when youre looking at it, the reason youre setting them up is for crime control, isnt it?
A.      Yes sir.
Q.      I mean, you dont do it because you dont have anything else in your life going on; youre doing it because you want to control crime?
A.      Right.  

Gates asserts the above colloquy indicates the checkpoints were established for unconstitutional reasons.  However, Lt. Jenkins had specifically detailed how the site was chosen using the computer statistics regarding DUIs and speeding in a particular area.  Gates counsels questions were very general, and the responses given by Lt. Jenkins are not in conflict with the prior reasons given for the checkpoints.  
Protecting the public, though reducing crime, is a goal of checkpoints established based on the number of DUI and speeding cases in an area.  However, the checkpoint, which stopped Gates, was not established for the purpose of finding ordinary criminal wrongdoing or for general crime control.  It was established specifically because of the number of DUI and speeding cases in the particular area.  
As in Sitz, the intent of the checkpoint in this case did not violate the Fourth Amendment.  Sitz, 496 U.S. at 455 (In sum, the balance of the States interest in preventing drunken driving, the extent to which this system can reasonably be said to advance that interest, and the degree of intrusion upon individual motorists who are briefly stopped, weighs in favor of the state program. We therefore hold that it is consistent with the Fourth Amendment.).  Accordingly, we must look to whether the checkpoint violated the Fourth Amendment of the United States Constitution because it allowed too much discretion in the stops and tests performed.
II.      Discretion by Officers
Gates maintains the checkpoint violated the Fourth Amendment because it allowed the officers to retain too much discretion in the implementation of the stops.  We disagree and find the checkpoint was operated pursuant to the procedures approved by the United States Supreme Court.
Because stopping an automobile and detaining its occupants constitutes a seizure, the Fourth Amendment is implicated in this case, even though the purpose of the stop is limited and the resulting detention quite brief.  United States v. Martinez-Fuerte, 428 U.S. 543, 556-558 (1976).  The essential purpose of the proscriptions in the Fourth Amendment is to impose a standard of reasonableness upon the exercise of discretion by government officials, including law enforcement agents, in order to safeguard the privacy and security of individuals against arbitrary invasions.  Prouse, 440 U.S. at 653-54 (quoting Marshall v. Barlows Inc., 436 U.S. 307 (1978)).
In Prouse, the United States Supreme Court invalidated a discretionary, suspicionless stop for a spot check of a motorists drivers license and vehicle registration.  The officers conduct in that case was unconstitutional primarily on account of his exercise of standardless and unconstrained discretion. Prouse, 440 U.S. at 661.  The Courts primary consideration was that the officers were not stopping all vehicles, but were randomly choosing vehicles to stop and detain.  The Court explicated:

When there is not probable cause to believe that a driver is violating any one of the multitude of applicable traffic and equipment regulations--or other articulable basis amounting to reasonable suspicion that the driver is unlicensed or his vehicle unregistered--we cannot conceive of any legitimate basis upon which a patrolman could decide that stopping a particular driver for a spot check would be more productive than stopping any other driver. This kind of standardless and unconstrained discretion is the evil the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed, at least to some extent.

Id. 
The Court in Prouse was expressly concerned with the extent of the intrusion into the privacy of the driver or other occupants.  The Court found there was substantial anxiety created through the use of random stops and the required show of authority to the particular driver.  Prouse, 440 U.S. at 657.  The Court explained:  At traffic checkpoints the motorist can see that other vehicles are being stopped, he can see visible signs of the officers authority, and he is much less likely to be frightened or annoyed by the intrusion.  Id. (quoting United States v. Oritz, 422 U.S. 891, 894-95 (1975)).  The Court then detailed one possible solution was to question all oncoming traffic at roadblock-type stops and then, with only brief periods of detainment.  Prouse, 440 U.S. at 663.  The United States Supreme Court was not as concerned by the actions after the stop as it was the reasons for the stop.  
In the instant case, Lt. Jenkins explicitly testified every vehicle was stopped as it passed though the checkpoint.  Whether the officers were under Lt. Jenkins command from York County or were from another agency, he announced that the plan established for the checkpoints required every vehicle be detained briefly.  He also described the checkpoint in detail; including the fact it was more than a sufficient distance from several possible turn-around locations.  The officers vehicles were stationary with lights flashing.  Finally, officers placed warning signs along the road allowing more than sufficient warning to alert drivers of the upcoming checkpoint.  
While the questions asked of the drivers may have varied based upon which officer was conducting the stop, Lt. Jenkins testified all stops were reasonably brief pursuant to the plan established.  Additionally, each officer conducted their own tests if they felt a driver might be intoxicated.  Deputy Vinesett conducted Gates test and detailed his process.  He explained Gates failure of each of the tests.  The stop was neither unreasonable, nor left to the unbridled discretion of the officers as in Prouse.  Prouse, 440 U.S. at 663.  Neither Sitz, Prouse, nor Edmond require the specific questions or actions performed by the officers after the stop to be pursuant to written guidelines or be in complete concert with one another. 
CONCLUSION
We find the checkpoint was established for the legitimate purpose of decreasing DUI and speeding in an area specifically targeted because of prior incidents.  The checkpoint was operated pursuant to guidelines, which took into consideration all of the concerns expressed by the United States Supreme Court in Prouse and Sitz.  The checkpoint did not entail random stops, nor were drivers detained for an unreasonable amount of time.  Drivers were warned of the approaching checkpoint and afforded the opportunity to turn around.  
We do not find the differences among the officers as to their questions or specific actions after the stop to be an unreasonable intrusion into the occupants privacy.  Additionally, we find the officers did not have unbridled discretion, nor did they have standardless and unconstrained discretion in making the stops.  Accordingly, we find the checkpoint utilized to stop and detain Gates was appropriate and did not violate the Fourth Amendment.  Gates conviction and sentence are
AFFIRMED.
 HUFF, KITTREDGE, and BEATTY, JJ., concur.