KAVANAUGH, Circuit Judge,
dissenting:
This case concerns drug testing of government employees who work at specialized residential schools for at-risk youth. In my view, Supreme Court precedent and common sense strongly support this narrowly targeted drug testing program. I would affirm Judge Howell’s decision for the District Court upholding the program. I therefore respectfully dissent.
I
Ratified in 1791, the Fourth Amendment prohibits “unreasonable” government searches and seizures. By establishing reasonableness as the legal test, the text of the Fourth Amendment requires judges to engage in a common-law-like balancing of public and private interests to determine the constitutionality of particular kinds of searches and seizures.
Difficult Fourth Amendment issues can arise when the government, in order to protect the public at large, deploys new technologies to search or surveil individual citizens. See, e.g., United States v. Jones, — U.S. —, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012) (GPS); Kyllo v. United States, 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) (thermal imaging); Florida v. Riley, 488 U.S. 445, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989) (helicopter surveillance); Katz v. United States, 389 U.S. 347, 88 S.Ct. *500 507, 19 L.Ed.2d 576 (1967) (listening devices).
Drug testing is one such example of a modern technology used to protect the public from harm. In part because of the increase in drug-related violent crime during the 1970s and 1980s, and particularly after the 1986 death of Len Bias, the ravages of drugs became the subject of great public concern and debate. Around the same time, drug testing technology became more widely available. Many private entities started drug testing their employees. Likewise, federal, state, and local government entities began to drug test in a variety of settings, including government workplaces and public schools.
Beginning in the late 1980s, the Supreme Court considered the Fourth Amendment implications of government-mandated drug testing. The Supreme Court approved government-mandated drug testing without a warrant or individualized suspicion when the testing was motivated by a “special need” beyond the normal need for law enforcement and the government’s interest in testing outweighed the intrusion on individual privacy. Applying that fact-specific balancing test in a series of cases, the Supreme Court upheld drug testing of certain government employees, as well as drug testing of public school students who participate in athletics or other competitive extracurricular activities. See National Treasury Employees Union v. Von Raab, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989); Skinner v. Railway Labor Executives’ Ass’n, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989); Vernonia School District 47J v. Acton, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995); Board of Education v. Earls, 536 U.S. 822, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002); cf. Chandler v. Miller, 520 U.S. 305, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997). For its part, this Court upheld drug testing of government drug counselors; other courts of appeals similarly approved drug testing of public school teachers, other public school employees, and public correctional officers. See National Federation of Federal Employees v. Cheney, 884 F.2d 603 (D.C.Cir.1989); Knox County Education Ass’n v. Knox County Board of Education, 158 F.3d 361 (6th Cir.1998); American Federation of Gov’t Employees v. Roberts, 9 F.3d 1464 (9th Cir.1993).[1]
II
No Supreme Court case has addressed drug testing of public school teachers or other public school employees. This case likewise does not require us to resolve that broader question because this case raises a far narrower issue: drug testing of public employees at residential public schools for at-risk youth where many of the students have previously used drugs. Applying the Fourth Amendment’s reasonableness standard and the fact-specific balancing test set forth by the relevant precedents, I would uphold the Department of Agriculture drug testing program at issue in this *501 case.[2]
The government has a strong interest in maintaining this narrowly targeted drug testing program. This limited program requires drug tests only for government employees who work at specialized residential schools for at-risk youth.[3] These residential schools bring economically disadvantaged and at-risk youth from troubled environments, house them in remote rural locations, and train them in various vocations. The students who attend the schools range in age from 16 to 24 and often have not finished high school. Many of the students have previously used drugs. These schools provide a chance— sometimes a last chance — for the students to straighten out their lives.
At these specialized residential schools, the potential for drug problems is obvious. After all, any residential school or camp with young people poses a risk of mischief ranging from the innocuous to the extremely dangerous. The hazards are magnified when, as here, the residents at the school are at-risk youth who have a history of drug use. Indeed, the United States Senate conducted an investigation in the 1990s and discovered rampant drug problems at these institutions.
A residential school program for at-risk youth who have a history of drug problems can turn south quickly if the schools do not maintain some level of discipline. To maintain discipline, the schools must ensure that the employees who work there do not themselves become part of the problem. That is especially true when, as here, the employees are one of the few possible conduits for drugs to enter the schools. Put simply, the Department of Agriculture has a strong and indeed compelling interest in maintaining a drug-free workforce at these specialized residential schools for at-risk youth.[4]
Moreover, on the individual privacy side of the ledger, it bears mention that this particular drug testing program — while no doubt intrusive and annoying like all drug testing — entails only a urine sample produced in private. It does not require observation or a physically invasive procedure. Cf. Florence v. Board of Chosen Freeholders of County of Burlington, — U.S. —, 132 S.Ct. 1510, 182 L.Ed.2d 566 (2012); Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); BNSF Railway Co. v. Dep’t of Transportation, 566 F.3d 200 (D.C.Cir.2009). In addition, this drug testing program reveals only whether the employee has used drugs; it does not disclose other private information — a fact the Supreme Court has noted in upholding other drug testing policies. See Von Raab, 489 U.S. at 673 n. 2, 109 S.Ct. 1384; cf. Jones, 132 S.Ct. at 954 (Sotomayor, J., concur *502 ring); id. at 957 (Alito, J., concurring in judgment).
Applying the fact-specific balancing test set forth by the relevant precedents, I would conclude that the government’s strong interest in ensuring a drug-free workforce at these schools outweighs the infringement of individual privacy associated with this drug testing program. In residential schools for at-risk youth, many of whom have previously used drugs, it seems eminently sensible to implement a narrowly targeted drug testing program for the schools’ employees. In these limited circumstances, it is reasonable to test; indeed, it would seem negligent not to test.
I therefore would affirm Judge Howell’s decision for the District Court upholding this drug testing program. Judge Howell summarized the issue persuasively:
Based upon the Court’s findings that all JCCCC employees must help maintain a drug-free environment for JCCCC students[;] their role as counselors, educators and adult supervisors to youth prone to drug use[;] and the employees’ responsibilities in maintaining a safe environment for residential students located in remote parts of the country, the Court concludes that the government has a compelling interest in testing these employees to ensure that they do not compromise the Jobs Corps’ overall educational program and do not put students at risk....
The defendants’ interests in testing JCCCC employees are not merely symbolic, but are directed toward maintaining the effectiveness of the JCCCC program and ensuring the safety of students located in remote rural sites across the country. This rationale overrides the employees’ expectation of privacy, which is already diminished considering the nature of their employment and the regulations already imposed upon them.
National Federation of Federal Employees-IAM v. Vilsack, 775 F.Supp.2d 91, 113 (D.D.C.2011).
I would rule that this narrowly targeted drug testing program is reasonable under the Fourth Amendment. I respectfully dissent.

. As the case law generally reveals, government-mandated drug testing of government employees is more likely to be permitted than government-mandated drug testing of private citizens. That dichotomy reflects the constitutional tradition that the government as employer has somewhat more flexibility in maintaining discipline and control over its own employees than it does in regulating private entities and individuals. See generally Von Raab, 489 U.S. at 671, 109 S.Ct. 1384; O’Connor v. Ortega, 480 U.S. 709, 717-18, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987) (plurality opinion); Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

. The only question in this case concerns application of the balancing test. The government has articulated a special need for this drug testing program beyond the normal need for law enforcement. See, e.g., Von Raab, 489 U.S. at 665-66, 109 S.Ct. 1384.

. The schools are formally called Job Corps Civilian Conservation Centers, sometimes abbreviated as JCCCCs.

. The majority opinion notes that not many employees have been caught using drugs. But the Supreme Court has cautioned that “[djetecting drug impairment on the part of employees can be a difficult task.” Von Raab, 489 U.S. at 674, 109 S.Ct. 1384. So a low detection rate without drug testing certainly does not itself mean that there is little drug use among the employees. To assume otherwise would be naive. Moreover, the Supreme Court has explained that even a few drug-using employees can pose problems in certain workplaces. Therefore, the "mere circumstance that all but a few of the employees tested are entirely innocent of wrongdoing does not impugn the program’s validity.” Id.