TRINIDAD SCHOOL DISTRICT NO. 1; the School Board of Trinidad School District No. 1; Louise Terry, President of School Board, in her official capacity; Sally Fabec, School Board member, in her official capacity; Felix A. Morreli, School Board member, in his official capacity; Charles Lochard, School Board member, in his official capacity; Rae Bulson, School Board member, in her official capacity; David Van Sant, Superintendent, in his official capacity; and Roy Bezona, Principal, in his official capacity, Petitioners/Cross–Respondents,

v.

Carlos R. LOPEZ, a minor child, By and Through his next friends, parents, and guardians, Luis A. LOPEZ and Marie S. Lopez, Respondents/Cross–Petitioners.

No. 97SC124.

Supreme Court of Colorado,
En Banc.

June 29, 1998.

Caplan and Earnest LLC, Alexander Halpern, W. Stuart Stuller, Boulder, Lee Allen Hawke, Trinidad, for Petitioners/Cross–Respondents.

The Law Offices of Luis A. Lopez, Luis A. Lopez, K. John Tannous, Trinidad, for Respondents/Cross–Petitioners.

Justice MULLARKEY delivered the Opinion of the Court.

We granted certiorari to review a drug testing policy promulgated by the Trinidad School District No. 1 Board of Education (Board) in July 1996.[1] The policy mandated

---

1. We granted certiorari on the following issues: 1. Whether the district court abused its discretion in its Findings of Fact and specifically, in finding that Trinidad School District No. 1 had a serious drug problem.

2. Whether the district court erred in holding that the School District's drug testing policy was not unconstitutionally vague and overly broad.

suspicionless urinalysis drug testing of all sixth through twelfth grade students participating in extracurricular activities. At the beginning of the 1996–1997 school year, the Trinidad School District No. 1 (School District) began regular testing of all students who wanted to take part in extracurricular activities. Carlos Lopez, a senior high school student who was enrolled in two for-credit band classes and participated in the school's marching band, refused to consent to the mandatory drug testing. Consequently, the District superintendent suspended Lopez from the band classes and the marching band.[2]

Lopez, by and through his parents, filed a complaint for permanent injunctive and declaratory relief on September 6, 1996 in the Las Animas County District Court (trial court). Lopez alleged among other things that the Policy violated his right to be free from unreasonable searches and seizures, as guaranteed by the Fourth Amendment to the United States Constitution.[3] Additionally, Lopez alleged that the Policy violated article II, section 7, of the Colorado Constitution.[4]

Lopez requested that the trial court enjoin the implementation of the Policy and that he be reinstated to the band classes and marching band.

After entering a temporary restraining order that required the District to reinstate Lopez to the band classes and the marching band, the trial court conducted a two day trial on Lopez's underlying complaint. In an order dated December 19, 1996, the trial court entered its findings of facts, conclusions of law, and judgment. The trial court held that the Policy was not unconstitutionally vague and that the Policy did not violate either the Fourth Amendment to the United States Constitution or article II, section 7, of the Colorado Constitution.

Lopez appealed from the trial court's order to the court of appeals. Pursuant to C.A.R. 50, both parties then sought expedited certiorari review in this court, which we granted. We now reverse. We hold that, under the facts of this case, the Policy is unconstitutional with respect to the marching band.[5]

---

3. Whether the district court erred in holding that the School District's policy of pre-participation drug testing for students enrolled in extracurricular activities and specifically the Marching Band did not violate the students' rights under the Fourth Amendment to the United States Constitution.

4. Whether the district court erred in holding that the School District's policy of pre-participation drug testing for students enrolled in extracurricular activities and specifically the Marching Band did not violate the students' rights under Article II, Section 7, of the Colorado Constitution.

5. Whether the district court erred in ruling that the School District's policy was lawful as applied to Respondent/Cross–Petitioner Carlos R. Lopez.

2. It is not clear from the complaint whether Lopez was formally suspended from both the marching band and the two band classes in which he was enrolled, or simply suspended from the marching band. The complaint merely refers to Lopez's suspension from "the Band." However, the band director testified that he understood that a student who refused to consent to drug testing would be suspended from both the marching band and the for-credit band classes. Lopez testified to the same effect. Even if the superintendent suspended Lopez from the marching band only, that suspension would have effectively prevented Lopez from continuing his enrollment in the for-credit classes because, as we explain in part VI–A of this opinion, a student

cannot pass the for-credit classes without participating in the marching band. Of course, Lopez was not suspended from the band classes or marching band because the trial court entered a temporary restraining order prohibiting his suspension. *See infra* note 11.

3. The Fourth Amendment to the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

4. Article II, section 7, of the Colorado Constitution provides:

The people shall be secure in their persons, papers, homes and effects, from unreasonable searches and seizures; and no warrant to search any place or seize any person or things shall issue without describing the place to be searched, or the person or thing to be seized, as near as may be, nor without probable cause, supported by oath or affirmation reduced to writing.

5. Because we hold that the Policy violated the United States Constitution, we need not address

## I.

The Policy, entitled "Drug Testing Student Athletes/ Cheerleaders/Extra Curricular," mandates drug testing for all students in grades six through twelve who want to participate in an extracurricular activity.[6] Under the Policy, the school principal is required to ensure that a student successfully completes an annual drug test prior to participating in the student's chosen first extracurricular activity of the year. In addition to the mandated testing, the Policy allows school officials to test any student participating in an extracurricular activity based on a reasonable suspicion that the student is under the influence of illicit drugs and/or alcohol. The Policy also requires that a student and the student's parent sign a written form acknowledging the student's consent to be tested. Any student who has been or is currently taking a prescription medication must disclose the use of that medication to school officials before taking the test.

The Policy establishes more severe consequences for successive violations. When a student's drug test indicates a positive result, the laboratory conducting the test performs a second test to confirm the results. If the second test is positive, the student's parent or guardian will be notified and the principal will conduct a due process hearing with the student and his or her parent or guardian. The student then must participate in a drug assistance program and undergo weekly drug tests over a six-week period. If the student refuses, the student will be suspended from participating in extracurricular activities for the current and subsequent seasons and must be tested again prior to the next season for which the student is eligible. If the student commits a second offense, the student's parent or guardian is notified, a due process hearing is held, and the student is suspended from participation in extracurricular activities for the current and subsequent seasons. Thus, when a student commits a second offense, the student does not have the option of enrolling in a drug assistance program in order to participate in the extracurricular activity. Finally, if a student commits a third offense, the student's parents are notified, a due process hearing is held, and the student is suspended from extracurricular activities for the current and next two seasons.

The Board adopted the Policy after two years of study led by the District's former superintendent. The superintendent hired The Search Institute of Minneapolis, Minnesota (Institute) to conduct an attitudinal and behavioral survey in grades six through twelve in the District.[7] The Institute reported that 44% of all students in grades six through twelve had used an illicit drug during the preceding twelve months, ranging from 23% in the sixth grade to 63% in the eleventh grade. According to the Institute's report, drug use in Trinidad schools exceeded national statistics. For example, 63% of Trinidad seniors reported using marijuana once in their lifetimes, compared to 35% nationally; 13% of seniors reported one-time cocaine use, compared to 6% nationally; and 20% of eighth grade students reported frequent drug use, compared to 5% nationally.

The trial court found that the scope of the drug problem, which it described as "serious, growing, and immediate," was confirmed by drug-related expulsions and testimony of the administrators, teachers, and coaches in the Trinidad schools. The trial court also found that the level of drug use was approximately

---

Lopez's arguments that even if the Policy did not violate the United States Constitution, the Policy nevertheless violated the Colorado Constitution.

**6.** As originally drafted, the Policy was limited to student athletes, which by definition includes any student in grades six through twelve who participates in athletic practices, cheerleading, and/or athletic contests. However, when the Board subsequently adopted the final version of the Policy on July 23, 1996, the Board expanded it to include students participating in extracurricular activities. We address the validity of the Policy only as applied to the marching band. We ex-

press no opinion on the application of the Policy to other student activities.

**7.** The Institute's survey asked students a wide variety of questions, including questions concerning family characteristics (e.g., whether the student's parents are divorced, parents' educational status, the number of the hours the parents work), attitudes toward school, involvement in activities, peer influence, values, self-esteem, alcohol use, tobacco use, sexuality, physical and sexual abuse, and drug use.

the same in the student body generally as it was among participants in athletics and other extracurricular activities.[8]

At the same time, however, the band director testified that he did not believe that drug use among band members had increased during the three years preceding the adoption of the Policy. He also testified that in his twenty-three years as the band director, no band member had ever been injured due to alcohol or drug use and there had never been an incident in which a band member had not been able to perform due to alcohol or drug use. In his view, band members were well-behaved and treated the other students with respect. The band director's testimony was mirrored by Dr. Fabec, a Board member, who testified that, in comparison to the student body generally, band members and others participating in extracurricular activities had better discipline records, were "less problematic," and were leaders of the student body in academic performance.

In its findings, the trial court explained the Board's reasons for selecting students involved in extracurricular activities as the target testing group. The trial court stated:

> These groups were selected for testing because they are role models for other students, and particularly for younger students. Participants in extracurricular activities have a high profile in the schools and within the community. They are representatives or ambassadors of the school district. For these purposes, marching band members are the same as student athletes, and cheerleaders. They represent the school at athletic events, fairs, and state competitions. Band members wear uniforms in the school colors with the school's name.

The trial court also found that some student athletes were using drugs and were encouraging others to do so.

The District began implementing the Policy at the beginning of the 1997 school year. The District hired an independent testing firm, New Choices, to administer the drug tests, to arrange for chemical analysis of the samples, and to report the test results to the administration. All students participating in the fall high school activities of volleyball, football, golf, cheerleading, and the marching band were required to submit to pre-participation drug testing. The District also tested students participating in the fall junior high school activities of volleyball, football, and cheerleading. In total, 181 out of approximately 500 high school students were tested and 90 out of 333 junior high school students were tested. Thus, approximately one in every three high school students was tested and one in every four junior high school students was tested.

The New Choices Director described the collection of band members' urine samples in the following manner. Students were called out of band class by grade level and taken to the high school gymnasium. Each student proceeded to a table staffed by the New Choices Director, presented the consent form, completed paper work related to the testing, and received a container in which the student was to provide a urine sample. A New Choices monitor then escorted the student to a nearby rest room. Once inside the rest room, the student entered a bathroom stall while the New Choices monitor stood outside of the stall.[9] After the student urinated in the container, the monitor escorted the student back to the New Choices Director's table where the student sealed and returned the container. The New Choices Director then checked the temperature of the sample and applied a label to the container.

---

8. The portion of the Institute's study concerning drug use was based on the student population in general. As explained in part IV of this opinion, the study did not quantify the level of drug use among participants in the various extracurricular activities.

9. Apparently, the intent was to monitor the students' urination by sound. However, in his answer brief, Lopez points out that the New

Choices monitor could observe male students in the stall. The record supports this assertion. The high school's football coach testified conclusively that the stalls did not have doors. Thus, it appears that the New Choices monitor in the men's rest room could listen to a male student urinating and was not prevented from watching the student from behind.

To prevent the possibility of sample tampering, the water to the rest room was cut-off and blue dye was placed in the toilet bowls. In addition, students were required to empty their pockets prior to proceeding to the rest room.

While the trial court found that no student complained about the procedure, one student was unable to produce a sample. The band director testified that the student "tried five, six, seven times," "every night after school," but could not urinate into the container because "he was embarrassed to do so."

After New Choices collected the students' urine samples, the agency forwarded them to a laboratory for testing. The laboratory tested samples for illicit drugs, including marijuana, cocaine, opiates, barbiturates, amphetamines, and phencyclidine.[10] The laboratory did not test the samples for alcohol.

Upon receiving the results from the laboratory, New Choices delivered a sealed report to the District's administrative office. The District's superintendent then transmitted the report to the respective school's principal, who kept it in a secure location. The principal subsequently informed the coach or extracurricular activity sponsor about any positive results. No other persons had access to the testing results.

Lopez, who at the time he brought the action was a seventeen-year-old senior at Trinidad High School, was enrolled in two band classes for which he received both credit and grades and participated in the Trinidad High School marching band.[11] As the trial court found, Lopez had been a member of the marching band since 1993 and was a gifted musician who played the baritone trombone, the piano, and the guitar. Lopez testified at the trial that he planned to pursue a music major in college and wanted to be a composer or enter into education.

After Lopez received the consent form in the beginning of the 1997 school year, he consulted with his parents and decided not to sign the form. Lopez testified that by not signing the form, he recognized that he "could be losing scholarship money, or experience that [he] need[ed]."[12] However, he indicated that he was willing to take that risk "because it's what this country was founded on, our rights" and that in his view, the drug testing program was "constitutionally wrong."

10. The consent form, which the Policy references, provides that students will be tested for any substance considered illegal or controlled by the Food and Drug Administration.

11. In its order, the trial court does not mention or discuss other music classes that were offered to Trinidad High School students. The only evidence in the record about other music classes at the high school came from the band director, who testified in response to a general question about his duties that he taught other classes in addition to the marching band classes: concert band, jazz band, honor bands, solo ensembles, and modern ensembles. There is no evidence in the record to reflect whether Lopez was interested in taking these other courses in lieu of the two band courses in which he enrolled, nor is there any evidence in the record which allows for a comparison of the content of these courses.

12. The District points out in its answer/reply brief filed with this court that Lopez completed his participation in the marching band by the time of the trial, which according to the District meant that "barring some unforeseen circumstance that would prevent his graduation, Mr. Lopez almost certainly would not be exposed to drug testing again." As noted, the trial court originally entered a temporary restraining order requiring the District to reinstate Lopez to the band classes and marching band. The temporary restraining order, which was dated September 6, 1996, also prevented the District from suspending Lopez from band for refusing to consent to drug testing. On September 13, 1996, the trial court entered an order extending the temporary restraining order until further order of the court. The two day trial occurred on October 31, 1996 and November 1, 1996. On December 19, 1996, the trial court entered its findings of fact, conclusions of law, and judgment, which dismissed Lopez's complaint. Because marching band had concluded by the time the trial occurred, it appears that Lopez was able to complete marching band without having to submit to drug testing. It is not clear, however, whether the issue of drug testing became moot for Lopez after marching band ended. At trial, Lopez testified that he planned to try out for baseball later that school year. Given the dates of the trial and the trial court's order, the record does not indicate whether Lopez subsequently tried out for baseball or any other extracurricular activities or whether he decided not to pursue any of these activities because of his decision not to consent to drug testing.

## II.

Before discussing the constitutionality of the Policy, it is necessary to be clear about what this case is not about. Although Lopez challenges the Policy as a whole on vagueness grounds, an argument which we address below, he does not challenge the part of the Policy that allows school officials to administer a drug test to a student based on reasonable suspicion that the student is under the influence of illicit drugs.[13] Rather, he challenges the *suspicionless* testing allowed under the Policy. Consequently, it is unnecessary to revisit our decision in *People in Interest of P.E.A.*, 754 P.2d 382 (Colo.1988), where we considered the Fourth Amendment limitations on searches based on school officials' reasonable suspicions that a student violated the law or a school rule. *See P.E.A.*, 754 P.2d at 386–90 (applying *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985), and holding that the school officials' search of the defendant's car in that case was constitutional).

This case also does not require a reexamination of our prior opinion in *University of Colorado v. Derdeyn*, 863 P.2d 929 (Colo. 1993). In *Derdeyn*, we considered a challenge to the University of Colorado's random, suspicionless urinalysis drug-testing of intercollegiate student athletes attending the university. In analyzing whether the university's drug testing policy violated the Fourth Amendment to the United States Constitution and article II, section 7, of the Colorado Constitution, we distinguished college students from high school students. *See Derdeyn*, 863 P.2d at 938–39. We found the case law related to high school student athletes of "only marginal relevance" and instead followed case law involving searches of adults in the work place. *Id.* at 939. Thus, given that our analysis in *Derdeyn* centered around the testing of college students, we do not find it necessary to revisit our holding in *Derdeyn* that the university's drug testing policy was unconstitutional.

## III.

Preliminarily, we address two threshold issues. First, the District's suspicionless drug testing must constitute a "search" within the meaning of the Fourth Amendment in order to trigger the protections of that amendment. Second, because Lopez is no longer a student at Trinidad High School, we must consider whether or not we should decline to review this case because it is moot.

### A.

■ In *T.L.O.*, the Supreme Court explained that it is now beyond dispute that the Fourth Amendment, as applied to the states by virtue of the Fourteenth Amendment, prohibits unreasonable searches by state officers. *See T.L.O.*, 469 U.S. at 334, 105 S.Ct. 733. Equally well settled is the proposition that the Fourteenth Amendment protects the rights of students against encroachment by public school officials, including boards of education. *See id.* Thus, the Fourth Amendment's prohibition against unreasonable searches and seizures applies to searches undertaken by public school officials. *See id.* at 336–37, 105 S.Ct. 733.

■ State-compelled collection and testing of urine constitutes a "search" subject to the demands of the Fourth Amendment. *See Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 652, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (explaining that the Fourth Amendment applies to a school district's drug-testing program involving urine collection and analysis). *See also National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 665, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (explaining that "urine tests are searches [and] it follows that the Custom Service's drug-testing program must meet the reasonableness requirement of the Fourth Amendment"); *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 617, 109 S.Ct. 1402,

**13.** The section of the Policy allowing for suspicion-based testing provides:

> Random Testing—any student athlete [or any *student participating in an extracurricular activity*] is subject to random drug-testing throughout the school year, provided the Su-

perintendent of Schools, School Principal, and Athletic Director agree and have reasonable suspicion to believe that a student athlete [or any *student participating in an extracurricular activity*] is under the influence of illicit drugs and/or alcohol.

103 L.Ed.2d 639 (1989) (explaining that "[b]e-cause it is clear that the collection and test-ing of urine intrudes upon expectations of privacy that society has long recognized as reasonable, the Federal Courts of Appeals have concluded unanimously, and we agree, that these intrusions must be deemed searches under the Fourth Amendment").

In this case, the Policy requires mandatory collection and testing of students' urine. The Policy was enacted and implemented by pub-lic school officials. Consequently, the urinal-ysis drug testing undertaken pursuant to the Policy is a search for Fourth Amendment purposes.

### B.

██ The District argues in its opening brief that the case now before us is moot. According to the District, because Lopez re-cently graduated from high school, he is be-yond the reach of the Policy. Since no other student is before this court challenging the constitutionality of the Policy, the District asserts that there is no longer a live contro-versy in this case. Additionally, the District argues that we should not apply the "capable of repetition but evading review" exception to the mootness doctrine because younger stu-dents will have sufficient time to litigate fully a constitutional challenge to the Policy.

Ordinarily, a court invokes its judicial pow-er only when an actual controversy exists between adverse parties. *See In re Tomlin-son*, 851 P.2d 170, 173 (Colo.1993). An issue becomes moot when the relief granted by the court would not have a practical effect upon an existing controversy. *See Brown v. Colo-rado Dep't of Corrections*, 915 P.2d 1312, 1313 (Colo.1996). When an issue is moot, a court normally refrains from addressing it. *See id.*

██ The mootness doctrine, however, does not always close the door to judicial review. We have stated that there are two exceptions to the mootness doctrine. *See Board of Chi-ropractic Exam'rs v. Stjernholm*, 935 P.2d 959, 971 (Colo.1997). First, we may resolve what is an otherwise moot case when the issue involved is one that is capable of repeti-tion yet evading review. *See id.; see also*

*Roe v. Wade*, 410 U.S. 113, 125, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Second, we may decide a moot case involving issues of great public importance or recurring constitutional violations. *See Board of Chiropractic Exam'rs*, 935 P.2d at 971.

In our view, both exceptions apply in this case. First, we reject the District's argu-ment that the "capable of repetition yet evad-ing review" exception does not apply because younger students in the District would have sufficient time to litigate fully the constitu-tionality of the Policy prior to graduating from the District. Were we to accept that argument, we would preclude students ap-proaching the end of their education in the District from challenging the Policy. Conse-quently, those students would be forced to rely on the hope that a younger student and his or her parents would initiate a case against the District. We will not require Lopez (and students similarly situated) to depend on other students to assert a viola-tion of the Constitution simply because it is not possible for Lopez to litigate a case through the appellate process prior to gradu-ating from the District.

Second, we consider the potential invasion of students' constitutional rights to be a mat-ter of great public importance. The fact that Lopez no longer falls within the purview of the Policy does not diminish this conclusion. Although Lopez no longer has to submit to the mandated urinalysis, all other students currently wishing to participate in extracur-ricular activities in the District must do so. Thus, it is appropriate for us to review Lo-pez's constitutional challenges to the Policy, notwithstanding the fact that he is no longer a student in the District.

### IV.

Lopez first argues that the trial court abused its discretion in finding that the Dis-trict had a "serious, growing, and immediate drug problem." Lopez specifically chal-lenges the Institute's report and the trial court's reliance on that report when it made its finding regarding the District's drug problem.

■ We review the trial court's findings concerning the level of drug abuse in the District under a clearly erroneous standard. Colorado Rule of Civil Procedure 52 provides in relevant part:

> In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon.... Findings of fact shall not be set aside unless clearly erroneous....

C.R.C.P. 52. In *Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), the Supreme Court similarly explained that while determinations of reasonable suspicion and probable cause under the Fourth Amendment should be reviewed *de novo* on appeal, a reviewing court should review findings of historical fact for clear error. Thus, while we review the trial court's conclusions about the constitutionality of the Policy *de novo,* including its analysis concerning the reasonableness of the Policy, we review the trial court's findings regarding the level of drug abuse in the district under the clearly erroneous standard.

■ Applying that standard here, we do not agree with Lopez that the trial court erred in finding that the District had a serious drug problem. We agree with the trial court that the Institute's report provided credible evidence of drug use in the District. Accordingly, we do not find that the trial court's reliance on the Institute's report was clearly erroneous.

■ Having concluded that the trial court's findings concerning the District's drug use problem in general were not clearly erroneous, our review of the record indicates that the trial court's order contains two specific findings of fact that were clearly errone-

ous and both findings bear on our analysis. First, the trial court found:

> The level of drug use is approximately the same among the student body generally and participants in athletics and other extracurricular activities in particular. The high level of participation in activities (at least one-third of the total school population) and the high level of drug use logically support such a conclusion.

This finding has no basis in the record and is nothing more than speculation. The portion of the Institute's report concerning drug use was based on overall drug use in the District and did not quantify drug use by particular groupings, such as drug use among those participating in athletics and/or those participating in other extracurricular activities. Additionally, while the District presented anecdotal testimony from teachers and coaches concerning their impressions of drug use in the District, the trial court did not have before it any testimonial evidence, other than testimony from the high school football coach, which allowed the trial court to compare across extracurricular groups the percent of students abusing drugs generally or the percent of students using particular types of drugs.[14] Thus, we do not accept the trial court's findings that the level of drug use in the District generally was the same as the level of drug use across extracurricular activities. Without a discrete study focused on a particular subset of the entire student body, no conclusion can be drawn about the rate of drug use in that subset. The rate may be higher, lower, or the same as the rate for the student body as a whole.

Second, in its findings of fact, the trial court stated the following:

> All students in the junior high school and the high school are required to attend

---

**14.** A review of the record indicates that there were only four questions with the following responses inquiring about drug abuse among students participating in athletics and/or extracurricular activities as compared to the general population: (1) the high school football coach testified that "[f]ootball, as far as percentage, I would say probably close to the same as the student body;" (2) the band director testified that as for marching band members, that he "did not have any clear-cut facts at my disposal that indicates any usage, to me," but that he "would

*speculate* it to be the same as [the] general population" (emphasis added); (3) the junior high school principal testified that he "couldn't answer" the question whether the percentage of students in the general population using drugs was the same as students in the athletic program; and (4) the Board President testified that she "can't make that analysis" when asked to compare drug use among student athletes or students participating in extracurricular activities to students in the general population.

physical education classes. In connection with these classes, the students dress, undress, and shower in communal facilities on a daily basis.

The only evidence in the record concerning physical education in the high school came from a physical education teacher and Lopez himself. The physical education teacher testified that students in the high school are required to take only one year of physical education while in high school and are *not* required to shower. Lopez explained that the high school students enrolled in physical education are *not* required to undress completely and that they are *not* required to shower. As for junior high students, the junior high principal stated, *"[S]ome students have to take showers and some students have a problem with that* so we have them meet with a counselor. Sometimes, we make arrangements for them to come in earlier to dress or later after the kids until they are comfortable in showering with them." (Emphasis added.) Thus, based on a review of the record, we conclude that the trial court's findings on the type of undressing and showering that occurs in the District during physical education are clearly erroneous and we reject them. *See* C.R.C.P. 52; *Arapahoe County Bd. of Equalization v. Podoll*, 935 P.2d 14, 18 (Colo.1997) ("Ordinarily, we will defer to the district court's findings of fact unless they are clearly erroneous and not supported by the record.").

Thus, for purposes of this opinion, the evidence shows a serious drug problem in the general student body. However, other than anecdotal information about the football team, there is no relevant information about drug usage among students who participate in extracurricular activities. Also, there is no evidence of diminished expectations of privacy among the student body at large based on participation in physical education classes.

## V.

 Lopez argues that the Policy is unconstitutionally vague.[15] The essence of his vagueness argument is that the Policy refers to "extra curricular" in the caption of the Policy, while the remainder of the Policy refers only to athletes and cheerleaders.[16] He also asserts that the Policy is deficient because it does not address which drugs the test is designed to detect, but rather, leaves that decision up to the District's business manager and a New Choices representative.

Due process requires that "laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)). In our view, "extracurricular" is not a vague term and it is clear that students participating in extracurricular activities are included within the Policy. Moreover, the consent form which students took home and which was referenced in the Policy explicitly states that students participating in extracurricular activities must submit to drug testing and that the substances tested are those considered illegal or controlled by the Food and Drug Administration. The drugs actually screened by the test fell within the parameters indicated by the Policy. Accordingly, we do not agree with Lopez that the Policy was unconstitutionally vague.

## VI.

### A.

Before directly addressing Lopez's arguments that the Policy gives rise to an unconstitutional search, we first analyze the actual scope of the Policy. Trinidad High School

---

**15.** Whether or not the Policy is unconstitutionally vague is a separate inquiry from our discussion in part VI of this opinion where we consider the Policy's actual scope, which reached students enrolled in the District's regular curriculum.

**16.** At its July 23, 1996 meeting, the Board expanded the Policy to include all students in extra-

curricular activities. *See supra* note 6. Apparently, while the Policy heading was amended to include "extra curricular," the text of the Policy remained unchanged. Thus, the text of the Policy only refers to student athletes, which by definition includes cheerleaders.

offers two elective band classes, a brass/percussion class and a woodwinds class. Both of these classes are for-credit classes and are graded. A student enrolling in either or both of these classes is required to' participate in the marching band and a student's grade depends in part on the student's performance in the marching band. Conversely, in order to participate in the marching band, a student must enroll in one or both of the band classes.[17] In other words, two for-credit classes that are part of the regular curriculum of course offerings are inextricably linked to the "extracurricular" activity of marching band. Properly viewed, there are two aspects to this connection. First, in order to take a for-credit class, for which the student will receive both credit and a permanent letter grade, the student *must* participate in the marching band. The record reflects that the consequence of enrolling in a class and failing to participate in the marching band is severe: the student will receive a failing grade. Second, in order to participate in the marching band, the student must also take the for-credit class. Thus, while a cursory reading of the Policy indicates that it reaches only those students who are participating in voluntary extracurricular activities, the real scope of the Policy is not so limited.

Under the Policy, students who are enrolled in a regular class must provide a urine sample for drug testing. With this more accurate understanding of the Policy in mind, we now consider whether or not the Policy can withstand constitutional scrutiny.

## B.

In *Vernonia*, the Supreme Court established the framework for analyzing the constitutionality of a public school district's drug testing program similar to the one we consider here. *See Vernonia*, 515 U.S. at 654–64, 115 S.Ct. 2386. The drug testing program at issue in *Vernonia* authorized random urinalysis drug testing of students who participated in that school district's athletics programs (the Vernonia policy).[18] *See id.* at 650, 115 S.Ct. 2386.

In considering the constitutionality of the Vernonia policy, the Supreme Court first reviewed the problem of drug abuse in the Vernonia schools and among the student athletes. *See id.* at 648–50, 115 S.Ct. 2386. The Supreme Court explained that "[n]ot only were athletes included among the drug users but, as the District Court found, athletes were the leaders of the drug culture." *Id.* at 649, 115 S.Ct. 2386. The Vernonia School

17. The trial court order states, "Trinidad High School offers its students two elective band classes for credit, a brass/percussion class and a woodwinds class. A student may not enroll in the marching band class unless they are enrolled in both of the band classes." While Lopez was enrolled in both classes, the record reflects that not all band class students take both classes. Specifically, the marching band director testified that there are some students who take the brass/percussion class but not the woodwinds class and vice-versa. Nevertheless, any student enrolled in the brass/percussion class and/or the woodwinds class *must* participate in the extracurricular activity of the marching band. Consequently, whether the student is enrolled in only one or both of the for-credit classes does not affect our analysis.

18. Our research indicates that since *Vernonia*, approximately 100 opinions have cited the case. Of those opinions, only one case considered the constitutionality of a public school system's suspicionless drug testing program. In *Todd v. Rush County Schools*, 133 F.3d 984, 984–87 (7th Cir.1998), *reh'g en banc denied*, 139 F.3d 571 (7th Cir.1998), the Seventh Circuit upheld an Indiana school district's random, suspicionless drug testing policy for students seeking to partic-

ipate in any extracurricular activity. Although the post-*Vernonia* case law is scant, commentators' views about *Vernonia* have filled the law reviews. *Compare* Irene Merker Rosenberg, *Public School Drug Testing: The Impact of Acton*, 33 Am.Crim. L.Rev. 349 (1996) (criticizing *Vernonia* for minimizing the plaintiff's interests and deeming the plaintiff's parents' interests as nonexistent and arguing for considerations of the impact on students' autonomy, sense of bodily integrity, sense of fairness, and the limits of governmental power), Jennifer Y. Buffaloe, Note, *"Special Needs" and the Fourth Amendment: An Exception Poised to Swallow the Warrant Preference Rule*, 32 Harv. C.R.-C.L. L.Rev. 529, 551–556 (1997) (criticizing *Vernonia's* balancing test for inadequately protecting the rights guaranteed by the Fourth Amendment), *and Drug Testing—Student Athletes*, 109 Harv. L.Rev. 220 (1995) (criticizing the opinion for a lack of doctrinal coherence and government responsibility), *with* Roscoe C. Howard, Jr., *Vernonia School District 47J v. Acton: The Right Response for Drug Testing of Student Athletes*, 6 Kan. J.L. & Pub. Pol'y 17 (1997) (arguing *Vernonia* reached the proper result under the Fourth Amendment).

District's administrators were particularly concerned about the risk of sports-related injuries due to drug use. *See id.* The Supreme Court also noted the trial court's findings that a large segment of the student body, particularly those involved in athletics, was in a state of rebellion, which coincided with the school staff's observations of drug use and glamorization of drug use. *See id.*

Next, the Supreme Court reviewed the purpose and scope of the Vernonia policy. *See id.* at 650–51, 115 S.Ct. 2386. The expressed purposes of the Vernonia School Board in adopting the Vernonia policy were to prevent student athletes from using drugs, to protect their health and safety, and to provide drug users with assistance programs. Under the Vernonia policy, students wishing to play sports were tested at the beginning of the season for their sport. In addition, ten percent of the student athletes were randomly selected for weekly testing.

■ After concluding that the drug testing at issue in *Vernonia* fell within its "special needs" Fourth Amendment jurisprudence,[19] the Supreme Court applied a three factor test. *See id.* at 653–64, 115 S.Ct. 2386. First, the Court considered "the nature of the privacy interest upon which the search here at issue intrudes." *Id.* at 654, 115 S.Ct. 2386. Second, the Court looked at "the character of the intrusion that is complained of." *Id.* at 658, 115 S.Ct. 2386. Third, the Court assessed "the nature and immediacy of the governmental concern at issue here, and the efficacy of the means for meeting it." *Id.* at 660, 115 S.Ct. 2386. We discuss below each of these factors as they apply in this case.

### 1. Nature of the Privacy Interest

■ The *Vernonia* Court explained that, while "children assuredly do not 'shed their constitutional rights ... at the schoolhouse gate,'" *Vernonia,* 515 U.S. at 655–56, 115 S.Ct. 2386 (quoting *Tinker v. Des Moines*

*Indep. Community Sch. Dist.,* 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969)) (omission in *Vernonia*), the Fourth Amendment rights are different in public schools from elsewhere. *See id.* at 656, 115 S.Ct. 2386. At the outset, the Supreme Court emphasized that the State's power over school children is custodial and tutelary in nature. *See id.* Noting that students are routinely required to have physical examinations and vaccinations, the Court next explained that students within the school environment have a lesser expectation of privacy than members of the population generally. *See id.* at 656–67, 115 S.Ct. 2386. The Court then turned specifically to the student athletes' privacy expectations, explaining that athletes have an even lesser expectation of privacy for two reasons. First, the Court highlighted that "[l]egitimate privacy expectations are even less with regard to student athletes." *Id.* at 657, 115 S.Ct. 2386. On this point, the Court observed that "[s]chool sports are not for the bashful" as they "require 'suiting up' before each practice or event, and showering and changing afterwards." *Id.* Second, the Court explained that "[b]y choosing to 'go out for the team,' they voluntarily subject themselves to a degree of regulation even higher than that imposed on students generally." *Id.* Accordingly, "students who voluntarily participate in school athletics have reason to expect intrusions upon normal rights and privileges, including privacy." *Id.*

■ In discussing the students' expectations of privacy, the trial court in this case concluded that the privacy interests at stake for students affected by the Policy were the same as those in *Vernonia.* The trial court explained:

> The School District exercises substantial authority over student conduct in furtherance of its recognized custodial and tutelary role. Conduct in the school environ-

---

**19.** The Supreme Court has applied a "special needs" analysis in several prior cases. *See, e.g., T.L.O.,* 469 U.S. at 351, 105 S.Ct. 733 (Blackmun, J., concurring) ("Only in those exceptional circumstances in which special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable, is a court entitled to substitute its balancing of interests for that of the Framers."); *Griffin v. Wisconsin,* 483 U.S. 868, 873–74, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987) (explaining the Fourth Amendment analysis in special needs cases); *Skinner,* 489 U.S. at 619–20, 109 S.Ct. 1402 (same); *Von Raab,* 489 U.S. at 665–66, 109 S.Ct. 1384 (same).

ment is highly regulated. All students are subject to a comprehensive Code of Conduct governing their behavior. Some student athletes are also subject to more stringent regulations as team members. All students also have a reduced expectation of personal privacy, not just student athletes. All students participate in "communal undress" in the required physical education classes.

After analyzing the Policy and the record, however, it becomes abundantly clear that the latter two points concerning student athletes which the Supreme Court emphasized in *Vernonia* do not apply to members of the marching band. We therefore do not agree with the trial court that this case is indistinguishable from *Vernonia* in terms of the privacy interests affected by the Policy.

First, one can hardly argue that the marching band is "not for the bashful." *Vernonia*, 515 U.S. at 657, 115 S.Ct. 2386. Although band members wear uniforms, they do not undergo the type of public undressing and communal showers required of student athletes.[20] While the trial court stated that all students undergo "communal undress," the record indicates a qualitatively different type of undressing from the communal undressing the Supreme Court described in *Vernonia*. As we previously explained, Lopez testified that high school students taking physical education are *not* required to undress completely. Lopez and the high school physical education teacher both testified that students enrolled in physical education *do not* have to shower. Additionally, high school students are only required to take one year of physical education class and Lopez testified that he only took physical education for three semesters in high school. Thus, all students in the District are not required to enroll in physical education every school year. And, for those who do enroll, they do not undergo the same type of communal undressing and showering that the Supreme Court described in *Vernonia*. Additionally, the junior high school makes special arrangements for those students who are not comfortable showering after physical education classes.

Second, the Trinidad testing program is not limited to students voluntarily choosing to participate in an athletic activity. As discussed, students who take a for-credit instrumental music class offered by the school will be subjected to drug-testing. In our view, the type of voluntariness to which the *Vernonia* Court referred does not apply to students who want to enroll in a for-credit class that is part of the school's curriculum.

The trial court failed to acknowledge these distinctions in concluding that *Vernonia* dictates upholding the Policy. While we recognize that students in the public school system have lesser expectations of privacy than adults in the general population, we view the absence of voluntariness and the qualitatively different type of undressing in this case as significant. *See Vernonia*, 515 U.S. at 666, 115 S.Ct. 2386 (Ginsburg, J., concurring) (explaining that the Supreme Court reserves the question on whether a school district could impose mandatory testing on all students and noting that "[t]he Court constantly observes that the School District's drug-testing policy applies only to students who voluntarily participate in interscholastic athletics"); *see also* 4 Wayne R. LaFave, *Search and Seizure* § 10.11(b), at 821 (3d ed.1996) (explaining that the *Vernonia* Court "deemed important" the student athletes' lower legitimate expectations of privacy and the voluntariness of athletic participation). We thus conclude that the students tested here had higher privacy expectations than the students in *Vernonia*.[21]

---

20. The band director testified that members of the marching band "are instructed to wear either shorts or cut-offs and a T-shirt so the band uniform can simply slip on and off quickly and easily." The band director also testified that marching band members do not shower together after a performance.

21. We emphasize that we do not hold that the students affected by the Policy had higher expec-

tations of privacy than the students in *Vernonia* based solely on the fact that the Policy required students receiving academic credit to be tested. As we have explained, the students affected here also were not subject to the type of communal undressing that the *Vernonia* Court explained occurred in that case, a distinction which we view as highly relevant and important.

### 2. Character of the Intrusion

The trial court, similar to the *Vernonia* opinion, likened the mandated urinalysis testing in this case to every day use of the rest room. The trial court stated:

Moreover, the conditions during the taking of the urine sample are indistinguishable from the ordinary use of the school restrooms. The Court concludes that, as in *Vernonia*, the personal privacy interest allegedly affected in gathering the urine samples from students is "negligble."

(Citation omitted.)

We question the trial court's conclusion that the ordinary use of the school's rest rooms was indistinguishable from the drug testing that took place here. Ordinarily, a student has some choice about when to use the rest room and when to urinate. The fact that one student was not able to urinate after several attempts because he was too embarrassed underscores this point. Ordinarily, a student does not have an official monitor, a person whose sole purpose is to prevent a student from altering the student's urine sample, listening to (and perhaps watching from behind) the student urinating. Ordinarily, a student does not have to urinate into a container and present his or her urine sample to *a school district representative* for temperature assessment, labeling, and preparation for analysis. Ordinarily, a student urinates simply because the body requires it, not because a school district insists that the student provide a urine sample on demand in order for the school district to search it for

the presence of drugs. Although we have difficulty understanding the equation of the testing here with every day use of the rest room, we will assume that the analysis set forth in *Vernonia* dictates that we treat the intrusion here as negligible.[22]

### 3. Governmental Concern and Efficacy of Means

In its order, the trial court explained the nature of the school district's interest in combating the drug problem in the District. The trial court explained:

It is beyond argument that the School District's interest in maintaining a safe school environment, free of criminal activity, and in protecting its students from the substantial dangers of illegal drug use is extremely significant, even compelling. The evidence clearly demonstrates that a serious drug-use problem exists in the Trinidad Schools, that it has resulted in a dramatic increase in major disciplinary problems, and that ordinary methods, such as drug education, have been ineffectual.

(Citation omitted.)

We agree that the nature of the Board's and the District's concern "is important—indeed perhaps compelling." *Vernonia*, 515 U.S. at 661, 115 S.Ct. 2386. Our main disagreement with the trial court's analysis, however, lies not in its emphasis on the District's drug problem, but in how the trial court treated the efficacy of the Board's cho-

---

**22.** In *Vernonia*, the Court also discussed the intrusion of students' privacy as it related to the information that the drug test disclosed and concluded that this intrusion was not significant. *See Vernonia*, 515 U.S. at 658–60, 115 S.Ct. 2386. The Court explained that the test only looked for drugs, that the drugs for which the test screened were standard drugs, and that only a limited class of school personnel received the test results. *See id.* at 658, 115 S.Ct. 2386. These considerations are identical in this case under the Policy and we therefore arrive at the same conclusion.

We also note that under the Policy a student must disclose any prescription medicines the student is taking before the District tests the student. If the student decides not to disclose such information and the mandated drug test reveals use of prescription drugs, the student is sanctioned just as if he or she tested positive for illicit

drugs. While the Vernonia policy contained a similar requirement, the *Vernonia* Court did not consider the required disclosure to alter its conclusion regarding the invasion of the privacy interests. *See id.* at 659–60, 115 S.Ct. 2386. The Court stated:

While the practice of the District seems to have been to have a school official take medication information from the student at the time of the test, that practice is not set forth in, or required by, the Policy.... [W]hen respondents choose, in effect, to challenge the [Vernonia policy] on its face, we will not assume the worst.

*Id.* at 660, 115 S.Ct. 2386 (citation omitted). Because Lopez makes a similar challenge here, we do not consider the required medication disclosure, despite the fact that such disclosure "raises some cause for concern." *Id.* at 659, 115 S.Ct. 2386.

sen means for addressing that problem. The trial court stated:

> The decision to address this problem by the drug testing procedure set forth in Policy 5541.1 was also reasonable. Plaintiff takes issue with the Board's selection of participants in extracurricular activities for drug testing because the evidence does not establish that students in these groups had a greater incidence of drug use than the student body as a whole. The relevance of this argument is slight.

We disagree with the trial court's conclusion.

■ In considering the efficacy of the Policy, the trial court failed to give proper weight to three important facts: 1) that the Policy swept within its reach students who were enrolled in for-credit, instrumental music classes and participated in the marching band, 2) that the Policy included student groups that were not demonstrated to have contributed to the drug problem in the District, and 3) that there was no demonstrated risk of immediate physical harm to members of the marching band.

Unlike the Vernonia policy, the Policy included all students participating in all extracurricular activities, as well as students who want to enroll in a for-credit class. There is no evidence in the record to suggest that marching band members are like "school athletes, where the risk of immediate physical harm to the drug user or those with whom he is playing his sport is particularly high." *Vernonia*, 515 U.S. at 662, 115 S.Ct. 2386. Indeed, the band director testified that during his twenty-three years as the band director, there had never been a drug-related injury to a student participating in the marching band. Nor is there evidence to suggest that the drug problem existing in the District was "largely fueled by the 'role model' effect" of the students who fell within the Policy's purview.[23] *Id.* at 663, 115 S.Ct. 2386. To the contrary, the marching band director stated that he had never had a problem with drug use interfering with marching band members' performances and there had been no increase in drug use among march-

ing band members in the three years preceding this case. The band director described the marching band members as "better quality kids in the school," meaning "well-behaved," and that they treated their fellow students with respect. As noted, a school board member who supported the Policy similarly explained that band members and students participating in extracurricular activities had better discipline records and performed better academically than did students in the general population. In our view, simply being a role model by virtue of participation in an extracurricular activity is insufficient to support a conclusion that the school's mandated drug testing program was reasonable. *See Chandler v. Miller*, 520 U.S. 305, 117 S.Ct. 1295, 1304, 137 L.Ed.2d 513 (1997) ("Indeed, if a need of the 'set a good example' genre were sufficient to overwhelm a Fourth Amendment objection, then the care this Court took to explain why the needs in *Skinner*, *Von Raab*, and *Vernonia* ranked as 'special' wasted many words in entirely unnecessary, perhaps even misleading, elaborations.").

The large number of students who were tested in this case raises an additional concern under the reasonableness inquiry. We acknowledge that students who participate in extracurricular activities that are strictly independent of a school's offered curriculum (unlike the marching band) do so on a technically volunteer basis. However, the reality for many students who wish to pursue post-secondary educational training and/or professional vocations requiring experience garnered only by participating in extracurricular activities is that they must engage in such activities. Lopez himself is the quintessential example. Additionally, involvement in a school's extracurricular offerings is a vital adjunct to the educational experience. *See Todd v. Rush County Schs.*, 139 F.3d 571, 571–73 (7th Cir.1998) (Ripple, J., dissenting from denial of rehearing) ("Exclusion of a high school student from all extracurricular activities deprives that student of a great deal of what the modern American high

---

23. The only evidence suggesting that any of the covered students played a role in promoting drugs came from the high school's football coach who testified that he believed that there were some athletes who encouraged others to use drugs. *See* part IV of this opinion.

school has to offer in terms of academic and personal development."). Being subjected to this type of search as part and parcel to that experience should give us pause before we accept wholesale the notion that drug abuse in the general student population requires such testing.

## VII.

Based on our analysis of all of these factors, we conclude that the Policy is not reasonable and thus cannot stand under the United States Constitution. First, the nature of the privacy interest invaded was different from that of the student athletes described by the *Vernonia* Court. The absence in this case of both true voluntariness and the type of communal undressing that occurred among the student athletes in *Vernonia* is significant. Second, while the District established that it has a drug abuse problem, the means chosen to deal with that problem were too broad. The Policy's actual scope extended vastly beyond the policy upheld in *Vernonia*. The Policy swept within its reach students participating in an extracurricular activity who were not demonstrated to play a role in promoting drugs and for whom there was no demonstrated risk of physical injury. The Policy also effectively included students enrolled in a for-credit class offered by the District. Even accepting the trial court's reasoning that the invasion of the students' privacy interests was negligible, we find these other distinctions between this case and *Vernonia* to be dispositive. Accordingly, having considered together the three factors announced by the *Vernonia* Court, we hold that the Policy is unconstitutional. We therefore reverse the trial court's order and remand the case to the trial court for further proceedings consistent with this opinion.

SCOTT, J., dissents, and VOLLACK, C.J., joins in the dissent.

KOURLIS, J., does not participate.

Justice SCOTT dissenting:

The Trinidad School District No. 1 Board of Education (Board) was confronted with a "serious, growing, and immediate drug problem." A two-year study revealed that "informational programs," the Drug Abuse Resistance Education Program (DARE), and health class lectures "were not effectively addressing the problem." A survey revealed that 63% of all students in the eleventh grade and 44% of all students in grades six through twelve had used an illicit drug, that cocaine use was twice the national average among seniors, and that "frequent drug use"[1] among eighth grade students exceeded other schools by 400%.

In response, the Board adopted a suspicionless drug-testing policy (Policy) including students in the high school marching band (Band). The Board reasoned that it could impose the Policy upon members of the Band, a voluntary activity that included participation in two for-credit, elective music classes only open to Band members. However, the Board reasoned without taking into account the constitutional significance the majority places upon the award of academic credit and its impact upon a student's reasonable expectation of privacy.

Because, in my view, the school Board acted "in furtherance of the government's responsibilities, under a public school system, as guardian and tutor of children entrusted to its care" and "the search is one that a reasonable guardian and tutor might undertake," *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 665, 115 S.Ct. 2386, 132 L.Ed.2d 564(1995), I respectfully dissent.

I, too, am at a loss to identify the role academic credit plays in our Fourth Amendment jurisprudence. Based on my reading of *Vernonia*, I cannot join a holding that recognizes enhanced expectations of privacy based on the award of academic credit alone. I find this especially true because the elective academic credit is awarded for participation in a voluntary activity and similar academic instruction is available for those who do not participate in the marching band.

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers and effects against unreason-

---

1. Frequent drug use was defined as use of six or more times in the last year.

able searches and seizures. . . ." U.S. Const. amend IV. In like regard, the Colorado Constitution provides: "The people shall be secure in their persons, houses and effects, from unreasonable searches. . . ." Colo. Const. art. 2, § 7. While I find voluntariness to be important here, I do not agree with the majority's reading that finds license to draw distinctions in privacy interests based upon whether the activity in question is part of the academic curriculum—whether or not the activity is an elective as opposed to a required course.

Based upon the record in this case, then, I would hold that the Policy adopted by the Trinidad School District is consistent with our state and federal constitutions. I am not persuaded that a constitutionally significant distinction exists between voluntary participation in an activity that is not required but includes attending an elective for-credit music class so as to result in an "absence of voluntariness," maj. op. at 1107. Nor do I believe that the "qualitatively different type of [communal] undress" combined with the Band rules and regulations is constitutionally "significant," *id.*, or at least not in a way that dictates a result contrary to *Vernonia.* Moreover, upon my reading of the record, I can find no basis for rejecting the factual findings of the trial court and disagree with the majority's substitution of its own findings for those of the trial court. Instead, I would leave credibility determinations to the trial judge. Therefore, unlike the majority, upon finding support in the record for the trial court's findings, I believe our legal reasoning must be limited on review to those facts considered by the trial judge.

Accordingly, I would affirm the ruling of the Las Animas County District Court upholding the Policy's validity.

## I.

### A.

While the majority's recitation of the standard of review is correct, that is, that a trial

court's findings cannot be reversed unless "clearly erroneous," maj. op. at 1103, in my view, testimony in the record is sufficient to support the trial court's findings. The majority combs through the record and testimony of witnesses, extracting selected portions of testimony to support its own conclusions of fact. The majority, sitting as an appellate court, fails to grant appropriate deference to the credibility determinations and inferences drawn by the trial court to reach its findings. Unless the trial court's findings are clearly erroneous, and they are not, our precedent dictates that a trial court's findings should not be disturbed on appeal. *See Arapahoe County Bd. of Equalization v. Podoll,* 935 P.2d 14, 18 (Colo.1997) ("Ordinarily, we will defer to the district court's findings of fact unless they are clearly erroneous and not supported by the record."); *see also* maj. op. at 1104 (citation omitted).

For students who choose to participate in the Band, the high school offers two elective music classes for credit which are taught by the band director, Duane Zanotelli. Zanotelli teaches six music classes. Students are required to enroll in at least one of two classes to become members of the Band and only students who participate in the Band may enroll in either of the two classes. Thus, every member of the Band is also a student in at least one of six music classes taught by Zanotelli. While I do not read the majority opinion to state otherwise, the record indicates that students who do not wish to participate in the Band can take one or more of four other music classes taught by Zanotelli.

Although other music classes were available to him, Carlos Lopez registered for the band classes and refused to consent to pre-participation drug testing as required by the Policy. Consistent with the Board's Policy, the high school suspended Lopez from the Band.[2] However, at no time was Lopez pre-

2. The record does not reflect whether Lopez would have been required to drop the two classes as a consequence of his refusal to consent to pre-participation drug testing. However, it is clear that four other for-credit music classes were available to Lopez. While the majority seems to attach some significance to the curricular aspects of the Band, Lopez does not raise, and I do not think it is appropriate to address, the loss of academic credits due to his refusal to submit to drug testing in order to participate in the Band. I agree with the majority that the trial court's

vented from enrolling in any of the other music classes that were taught by Zanotelli and that would facilitate his graduation from high school and complete his high school music training.

The trial court found that at the time the Policy was adopted, the Trinidad schools were confronted with a "serious, growing, and immediate drug problem." Based on that finding, the trial court ruled that application of the Board's Policy to Lopez, who *voluntarily* registered for the Band for-credit classes and not the other elective for-credit music classes, would not constitute an unreasonable search.

The trial court found, based on the testimony of the football coach and Zanotelli, that the level of drug use was about the same among Band members, athletes, and participants in other extracurricular activities as in the student body as a whole. Lopez presented no evidence suggesting that drug use among Band members differed from the rest of the student body. In light of the findings of the survey indicating that drug use was pervasive among students and the anecdotal accounts of the school district's witnesses, and in the absence of contrary evidence of any kind, the trial court was entitled to draw the entirely reasonable inference that band members are approximately as likely to use drugs as other students. *See Associates of San Lazaro v. San Lazaro Park Properties*, 864 P.2d 111, 115 (Colo.1993); *People in Interest of M.S.H.*, 656 P.2d 1294, 1297 (Colo. 1983); *Dominion Ins. Co. Ltd. v. Hart*, 178 Colo. 451, 454, 498 P.2d 1138, 1140 (1972).

Likewise, the trial court's findings on the intrusiveness of the drug testing were supported by permissible inferences from the record, and the majority errs by drawing its own set of inferences. Specifically, the majority recites the band director's testimony to the effect that one student was unable to produce a urine sample because "he was embarrassed to do so." Maj. op. at 1100.

The trial court, however, made no such finding.

The majority's assessment of the differences in the legitimate privacy expectations of athletes and band members is similarly grounded, at least in part, on factual inferences not drawn by the trial court and not compelled by the record. The majority states that students enrolled in mandatory physical education classes are not required to shower together, so the trial court's findings on this issue are clearly erroneous. *See* maj. op. at 1104. While communal showers may not be formally required, the record supports the trial court's finding that, as a practical matter, students in physical education classes undress and shower together "on a daily basis." Moreover, the record does not support the majority's assumption that students involved in extracurricular athletics are required to shower after finishing their activities any more than band members are required to do so.

### B.

The majority takes great care to attempt to limit its holding today "to the marching band." Maj. op. at 1097. Nonetheless, the majority relies upon facts dependent upon the reach of the entire Policy with respect to athletes and students engaged in extracurricular activities.

For example, if the majority's "hold[ing]," under the facts of this case" is that "the policy is unconstitutional with respect to the marching band," then it is unclear why the reach of the Policy as to "[a]ll students participating in the fall high school activities of volleyball, football, golf, [and] cheerleading," or the fact a total of "181 out of approximately 500 high school students were tested and 90 out of 333 junior high school students were tested," maj. op. at 1099, is material. A lower number—that is, 73—or the number involved in Band (or less than fifteen percent) seems to be far more germane to the majority's analysis. The fact that "one in every three high school students" and "one in

injunction protected Lopez from any consequences of his failure to be tested. However, the record does not support the majority's finding that Lopez was therefore precluded from taking

music classes altogether or lost "scholarship money" or "experience." Maj. op. at 1100.

every four junior high school students was tested," maj. op. at 1099, is irrelevant.

I share the majority's understanding that our review of the trial court's factual determinations is limited to determining whether the findings are clearly erroneous. *See* maj. op. at 1104; *see also Podoll,* 935 P.2d at 18. Based on my reading of the record, however, the majority fails to give sufficient deference to the trial court's findings of fact under this standard of review. Thus, facts not found by the trial court are subtly used to alter the legal outcome of the admittedly close legal questions in this case.

## II.

The Fourth Amendment to the United States Constitution guarantees the right to be free from unreasonable searches conducted by the government. *See Univ. of Colo. v. Derdeyn,* 863 P.2d 929, 936 (Colo.1993). I agree with the majority's conclusion that the collection and testing of urine samples for the purpose of detecting illegal drugs is a search within the meaning of the Fourth Amendment. *See* maj. op. at 1101; *Skinner v. Railway Labor Executives Ass'n,* 489 U.S. 602, 617, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989); *People v. Williams,* 192 Colo. 249, 257–59, 557 P.2d 399, 405–07 (1976). Accordingly, any school drug testing policy must pass muster under the Fourth Amendment, because students do not "shed their constitutional rights ... at the schoolhouse gate." *Tinker v. Des Moines Indep. Comm. Sch. Dist.,* 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). The policy also must be consistent with the privacy guarantees by Art. II, § 7 of our state constitution. *See Derdeyn,* 863 P.2d at 946.

However, the constitutional rights of students in the public schools must be balanced against the unique demands of the educational environment. *See New Jersey v. T.L.O.,* 469 U.S. 325, 346, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (upholding search despite absence of probable cause). Searches in the public schools, like other searches not solely intended to serve law enforcement purposes, are not necessarily unreasonable under the Fourth Amendment despite the absence of individualized suspicion. Therefore, in deciding whether the drug-testing Policy in this case violates the Fourth Amendment, we must conduct a "context-specific inquiry, examining closely the competing private and public interests advanced by the parties." *Chandler v. Miller,* 520 U.S. 305, 311, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997).

In *Vernonia School District 47J v. Acton,* 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995), the United States Supreme Court conducted such an inquiry in the context of public school drug testing, upholding a random urinalysis requirement for students participating in extracurricular athletics. The drug testing program was adopted in response to increased drug use. *Id.* at 649–51, 115 S.Ct. 2386.

The Court in *Vernonia* used a three-part analysis to determine whether drug testing in a public school is permissible without individualized suspicion: (1) the legitimate privacy expectations of the students involved; (2) the extent of the need for drug testing; and (3) the nature and extent of the intrusion on the students' privacy interests in light of the drug testing procedures involved. *See id.* at 654–63, 115 S.Ct. 2386.

Our task is to apply the standards announced in *Vernonia* to the drug testing policy adopted by Trinidad School District R–1 and applied to Lopez as a member of the Trinidad High School Marching Band. In doing so, I believe we must compare the findings of the trial court, unless not supported by the record, to the evidence before the *Vernonia* court. The majority also notes that *University of Colorado v. Derdeyn,* 863 P.2d 929 (Colo.1993), in which we struck down a program of random drug testing for college athletes, remains good law, and its facts illuminate the inquiry into the constitutionality of the program challenged here.

## III.

### A.

While "state-operated schools may not be enclaves of totalitarianism," *Tinker,* 393 U.S. at 511, 89 S.Ct. 733, the expectation of privacy enjoyed by students in these schools is unquestionably lower than in the general

population outside the public education system. Indeed, the public schools are entitled—and even expected—to exercise a degree of supervision and control over their students that would be constitutionally unacceptable if exerted over adults outside the schools. *See T.L.O.*, 469 U.S. at 339–40, 105 S.Ct. 733. These limitations on the constitutional rights of public school students are permitted because a public school must have the power to impose swift and informal discipline consistent with its custodial duties and to carry out its educational mission. *See id.*

In *Vernonia*, the student athletes covered by the random drug testing program were found to enjoy an even lower expectation of privacy than other students. This diminished expectation of privacy was due to several factors: (1) students participating in athletics are often heavily regulated; (2) communal undress in locker rooms is a more-or-less inherent feature of participation in high school athletics; and (3) the use of illicit drugs increases the risk of injuries where physical performance is required. The same factors apply with equal force here: (1) members of the marching band are subject to Band rules and regulations; (2) band members engage in communal undress, albeit limited; and (3) playing and performing marching formations while engaged in band competitions gives rise to the risk of injuries where physical performance is required.

However, the Supreme Court's finding that athletes have a lower expectation of privacy was not based entirely, or even primarily, on factors unique to athletics. For example, the *Vernonia* Court noted that participation in high school sports is voluntary, so students were not required to expose themselves to the possibility of drug testing. Most importantly, though, was the relationship of public schools to their students. The schools stand, if not "in loco parentis" with respect to minor students, then at least in a position of a significant degree of responsibility for the welfare of the children entrusted to their care:

The most significant element in this case is ... that the [p]olicy was undertaken in furtherance of the government's responsibilities, under a public school system, as guardian and tutor of children entrusted to its care.... [W]hen the government acts as guardian and tutor the relevant question is whether the search is one that a reasonable guardian and tutor might undertake.

*Vernonia*, 515 U.S. at 665, 115 S.Ct. 2386.

Applying these principles, I conclude that the degree of privacy enjoyed by members of a marching band at a public high school is significantly lower than that enjoyed by the general public. Moreover, the expectation of privacy is lower for Band members than for other students who voluntarily choose not to participate.

The majority notes that eligibility to participate in the Band is conditioned on enrollment in two band classes offered for credit, making the curricular and extracurricular components of the Band "inextricably linked." Maj. op. at 1105. This fact does not, however, transform the marching band from a voluntary into a mandatory activity for purposes of the privacy interests at stake for students who choose to participate. Indeed, the majority cites no authority for the proposition that the privacy interests at stake in an elective activity turn on whether or not academic credit is offered for participation.

In fact, Trinidad High School offers several for-credit music classes. Thus, the two elective classes available only to those participating in Band were not the only elective music classes offered by the school. Therefore, any student, including Lopez, could decide not to be tested and still receive for-credit elective music classes taught by Zanotelli. At the same time, and importantly here, the students who signed up for marching band knew that they were subject to drug testing. In my view, therefore, Band participation remained voluntary.[3]

3. The majority overlooks the fact that students have curricular options in the music department other than the Band. The band director testified that he teaches six music classes a day, including solo and modern ensembles, jazz band, and honor band. Any suggestion, therefore, that Lopez's collegiate career is in jeopardy or that he is unable to continue his music education at Trini-

For privacy purposes, I see no reason to distinguish between a voluntary extracurricular activity and an elective co-curricular activity.[4] In both situations, participation is optional, i.e., students are not required to play in the marching band in order to graduate any more than they are required to play on the football team. If the Trinidad schools gave physical education credit to members of the football team, the invasion of privacy resulting from mandatory drug testing would be no different, and the validity of the testing program as applied to athletes would not change. I simply cannot see any principled basis for drawing the line between co-curricular activities on one hand and entirely extracurricular activities on the other.[5]

The reasoning in *Derdeyn* is fully consistent with the foregoing analysis of the privacy interests of high school students involved in extracurricular activities. Almost all college students, unlike most high school students, are adults. As such, college students are not subject to intrusions on their privacy simply by virtue of their status as students. *See Derdeyn*, 863 P.2d at 938. In addition, post-secondary schools serve an almost exclusively educational—as opposed to custodial—function, and they educate students who are presumed to have reached the necessary degree of intellectual and emotional maturity to make decisions without the protections and disciplinary powers appropriate in the quasi-in loco parentis relationship found in our public secondary schools.

Unlike the evidence presented in *Vernonia*, the record in this case does not show that athletes or other students participating in extracurricular activities are or were the "ringleaders" of a drug-using clique in the public schools. However, the admitted evidence of a "serious, growing, and immediate drug problem," was more than sufficient for the trial court, not to mention the Board, to conclude that the drug problem in the Trinidad schools was quite serious, both in absolute terms and by comparison to other schools around the country.[6]

### B.

As we explained in *Derdeyn*, the interest served by suspicionless drug testing need not be "compelling" in the sense in which that term is used in other types of constitutional cases in order to survive scrutiny under the state or federal constitutions. *See Derdeyn*, 863 P.2d at 944. Instead, the relevant inquiry is the strength of the interests served compared with "other types of commonly

dad High School is contrary to the record and not consistent with the trial court's findings of fact.

4. For our purposes here, "extracurricular activities" are school activities for which no academic credit is granted, such as cheerleading or drama performances. "Co-curricular activities," such as Band, which include two for-credit classes in which only Band members participate, are school activities that take place at least partly outside of school hours, are graded, and result in the award of one academic credit for each class.

5. The first compulsory attendance statutes were adopted in the 1850s, and some states did not adopt such laws until the early 1900s, well after the adoption of the Fourth Amendment. *See* Mark Murphy, Note, *A Constitutional Analysis of Compulsory School Attendance Laws in the Southeast: Do They Unlawfully Interfere With Alternatives to Public Education?*, 8 Georgia State Univ. L.Rev. 457, 458 (1992). While I do not question that students in the public schools are protected by the Fourth Amendment, see *Tinker*, 393 U.S. at 506, 89 S.Ct. 733 (students do not "shed their constitutional rights ... at the schoolhouse gate"), I do not think the level of

protection they enjoy turns on whether academic credit is offered for the activity for which drug testing is a condition of participation. The majority cites no authority and offers no analysis in support of its assumption to the contrary.

6. In *Vernonia*, the Supreme Court stated it "can hardly be doubted" that the nature of a school board's concern regarding illicit drug use is compelling:

Deterring drug use by our Nation's schoolchildren is at least as important as enhancing efficient enforcement of the Nation's laws against the importation of drugs ... or deterring drug use by engineers and trainmen.... School years are the time when the physical, psychological, and addictive effects of drugs are most severe. "Maturing nervous systems are more critically impaired by intoxicants than mature ones are; childhood losses in learning are lifelong and profound"; "children grow chemically dependent more quickly than adults, and their record of recovery is depressingly poor."

*Vernonia*, 515 U.S. at 661, 115 S.Ct. 2386 (quoting Hawley, *The Bumpy Road to Drug–Free Schools*, 72 Phi Delta Kappan 310, 314 (1990)).

asserted interests that have been held sufficient or insufficient to justify similar intrusions." *Id.* The extent of the intrusion into the privacy of the school children tested under Policy 5541.1 seems commensurate with the gravity of the health problem associated with illicit drug use by minors which was facing Trinidad's school officials.

As the trial court observed, participants in the marching band were selected for testing because they were role models for other students, especially younger students. They represented their school in public performances and competitions, and they wore school uniforms with their school's name at these public events.

Based on the testimony presented at trial, the trial court found that the Board's selection of these students for testing was reasonable in light of their influence on other students. The Board reasonably concluded that the Policy would set a positive example for all students by showing that role models were drug-free.

### C.

As noted previously, the nexus between the group tested and the group thought to be encouraging the use of drugs is not as tight in this case as in *Vernonia,* where the record showed that the drug problem was particularly acute among athletes and that athletes were at the center of a rebellion against the school's anti-drug efforts. I do not read *Vernonia,* however, as requiring evidence that the group tested is precisely the same as the group in which drug use is heaviest or that the students tested are the leaders of a concerted effort to undermine anti-drug policies.

Instead, *Vernonia* recognizes that when confronted with a serious drug problem in the school system, educational officials may take reasonable steps to detect and deter drug use among the students entrusted to their care. The match between the problem identified and the students subjected to drug testing need not be perfect, because the school system is not equipped and should not be expected to meet the exacting standards applicable when a search is conducted for purposes of law enforcement rather than to meet the "special needs" of the educational environment. *See Vernonia,* 515 U.S. at 653, 115 S.Ct. 2386; *Griffin v. Wisconsin,* 483 U.S. 868, 873, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987).

The way the Policy is carried out and its rehabilitative and nonpunitive or non-law enforcement purposes reinforce my view that the intrusion into the privacy rights of the affected students is not unreasonable in relation to the interests served by the Policy.

Under Policy 5541.1, the results of any positive test are to be kept confidential, and the Policy specifically provides that the results are not to be used for law enforcement purposes or as the basis for punitive measures by school administrators. In *Derdeyn,* by contrast, university administrators declined to provide any meaningful assurance that the results of drug tests would be kept confidential. *See Derdeyn,* 863 P.2d at 942.

In addition, the University of Colorado declined to agree that it would not subject athletes to visual monitoring while they were engaged in the process of providing urine samples. *See id.* at 939. Visual monitoring was incorporated into an earlier version of the testing program, and the record included testimony from students who found that aspect of the testing offensive. *See id.* at 940 n. 22. By contrast, the students tested in this case were asked to enter a restroom and produce a urine sample while a member of the testing company staff stood nearby but did not visually observe the production of the sample.

In view of the evidence before the Board and the trial court that tended to establish the existence of a serious drug problem in the Trinidad school system, and in light of the circumstances surrounding the administration of the Policy, I would hold that the Board's Policy at issue in this case was reasonable under *Vernonia* and *Derdeyn,* even though it was applied to all members of the Band, rather than only to those students participating in sports. *See generally Todd v. Rush County Schs.,* 133 F.3d 984 (7th

Cir.1998) (upholding random drug tests of students in extracurricular activities).[7]

## IV.

This is a difficult case. Regardless of how one resolves this dispute, our sensibilities are subjected to the tension between the Board's intention to protect our children and the recognition of the privacy interest students have in being free from ˋ unreasonable searches, even while attending public school. Resolution of this conflict, for each of us, is not an easy task. Nonetheless, I believe the privacy right announced in the majority opinion must yield to the "special needs" that "exist in the public school context," as acknowledged by the United States Supreme Court. *See Vernonia,* 515 U.S. at 653, 115 S.Ct. 2386. However, while we must "consider[ ] ... the nature of the privacy interest upon which the search here at issue intrudes," *id.* at 654, 115 S.Ct. 2386, I believe that two other factors control: (A) The Fourth Amendment "does not protect all *subjective* expectations of privacy, but only those that society recognizes as 'legitimate,'" or as reasonable expectations of privacy; and (B) that "[c]entral ... to the present case is the fact that the subjects of the Policy are (1) children, who (2) have been committed to the temporary custody of the State as schoolmaster." *Id.* (emphasis added).

While the majority agrees that "the nature of the Board's ... concern 'is important—indeed perhaps. compelling,'" maj. op. at 1108 (quoting *Vernonia,* 515 U.S. at 661, 115 S.Ct. 2386), thereafter we part ways. The majority's concern that the testing reaches those "who are enrolled in for-credit, instrument music classes" and that "there was no demonstrated risk of immediate physical harm," maj. op. at 1109, in my view, should give way to the emergency circumstances confronting the Board: (1) the harm that 63% of eleventh graders and 44% of all students encounter daily by engaging in illicit drug use; and (2) the majority's own recognition that the Policy reached only those students engaged in "extracurricular activities ... on a ... volunteer basis." *Id.*

By the majority's decision today, this court bars the Board's studied and considered response to an admitted "serious, growing, and immediate" emergency that jeopardized the safety of most eleventh graders and almost half of all the students attending sixth through twelfth grade. In my view, that is not a result required by our constitution and the public policy response of the Board does not violate the reasonable expectations of privacy of the school children under its care and tutelage.

## V.

In sum, I would hold that the program of suspicionless pre-participation drug testing of students voluntarily involved in marching band embodied in Policy 5541.1 does not offend our state or federal constitutions. Where a school district is faced with evidence of a serious drug problem among its students, the officials charged with authority over its schools and the responsibility for the safety of its students are entitled to conduct such searches in the form of drug tests as may be reasonable. In light of the severity of the acknowledged illicit drug usage and scope of the intrusion that is clearly limited to voluntary activities, I do not see an unreasonable invasion of the privacy interests of the children under the Board's "responsibilities ... as guardian and tutor of children entrusted to its care." Therefore, I respectfully dissent from the majority opinion and its judgment.

I am authorized to say that VOLLACK, C.J., joins in this dissent.

---

7. Under the balancing of interests required by *Vernonia,* the validity of a drug testing program depends on the surrounding circumstances, and

I recognize that these circumstances may change. I would not, therefore, decide whether the current policy may be employed indefinitely.